# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COPART INC.,

    Plaintiff,

vs.

No. C 07 02684 CW

CRUM & FORSTER INDEMNITY
COMPANY, UNITED STATES FIRE
INSURANCE COMPANY, and DOES
1-10,

    Defendants.

CERTIFIED COPY

AND RELATED COUNTERCLAIMS.

DEPOSITION OF MICHAEL W. CARSON

San Francisco, California

Tuesday, May 20, 2008

Reported by:
DARCY J. BROKAW
RPR, CRR, CLR, CSR No. 12584

Job No. 86979



sarnoffcourtreporters.com

LAS VEGAS • LOS ANGELES • SAN DIEGO • SAN FRANCISCO

SARNOFF
Court Reporters and
Legal Technologies

1      We'll try to take some breaks at sort of
2 key chronological times, but if at any point you
3 need to take an unscheduled break, just let me know
4 and we'll try to accommodate you.
5      All right. With that, first I need to get
6 some basic background information from you.
7      Are you currently employed with Copart?
8  A  Yes.
9  Q  What is your current position or title?
10 A  National property manager.
11 Q  How long have you been the national
12 property manager?
13 A  Late '99 or early 2000.
14 Q  What are your responsibilities as national
15 property manager?
16 A  I am responsible for all of Copart's 146
17 American yards facilities, including Canada and
18 Alaska, the two facilities we have in Canada and the
19 16 facilities we have in the United Kingdom, Great
20 Britain, England, Ireland and -- England, Scotland
21 and Wales.
22 Q  And when you say you're responsible for
23 the properties, what in particular are you
24 responsible for?
25 A  Well, basically I was responsible for

10

1   <u>assisting in finding those properties, getting them</u>
2   <u>zoned, getting use permits, developing the</u>
3   <u>properties, constructing them, building them,</u>
4   <u>refurbishing those properties and making them usable</u>
5   <u>for company purposes.</u>
6       Q    <u>To whom do you report?</u>
7       A    <u>Our CEO.</u>
8       Q    Prior to becoming the national property
9   manager for Copart, did you hold any other position
10  with Copart?
11      A    I was a regional property manager.
12      Q    What was the time frame for that?
13      A    From '98 until promotion to national
14  property manager.  August of '98.
15      Q    As regional property manager, were your
16  responsibilities similar to your current
17  responsibilities but just limited to a particular
18  region?
19      A    No.  I was not assisting in finding and
20  developing and zoning properties.  I was strictly
21  responsible for construction and maintenance of
22  existing facilities; construction of new facilities
23  and maintenance of existing facilities.
24      Q    What was your region?
25      A    It was nebulous.

11

```
 1   And it was quite some time ago; I don't recall the
 2   date.  But it was based on no plans, no drawings,
 3   just based on their knowledge of the area, what
 4   things cost, and the fact that they had built for me
 5   before typical Copart cookie-cutter buildings.
 6            It was a no-liability estimate.  I
 7   wouldn't hold them to it, because they had no plans.
 8   You know, like what should we budget for a building
 9   of this sort in that area?  Well, you should budget
10   this much, give or take 100,000, 200,000, either
11   way.  I did have a budget for that.  And that was --
12   that was, Mr. Ruby, a year ago.  I don't know; it
13   could have been 14 months.
14            MR. RUBY:  Mark this as Exhibit 72.
15                 (Defendant's Exhibit 72 marked
16                  for identification)
17   BY MR. RUBY:
18       Q    All right.  Exhibit 72 is an e-mail chain
19   that starts at the bottom, actually, with an
20   August 28th, 2006 e-mail from Mr. Carson to Will
21   Franklin and Simon Rote, and then it looks like it
22   was forwarded to someone at a later date.  I want to
23   just focus on the e-mail from you to Mr. Franklin.
24       A    Okay.
25       Q    First of all, just take a moment to skim
```

MICHAEL W. CARSON                                             05/20/08

```
 1   it so you refresh your recollection, and then let me
 2   know when you're finished and I'll ask you some
 3   questions.
 4        A     I remember pretty well.
 5        Q     Okay.  Now, you've been talking about
 6   being asked by your boss to provide some information
 7   on repair costs.  Is this e-mail the response that
 8   you gave him?
 9        A     This was the initial response, yes.
10        Q     Now, as of August 28th, 2006, we know the
11   building had been demolished and, if anything was
12   going to happen, you'd have to put up a new
13   building.  But as of August 28th, 2006, had Copart
14   yet decided on what the new building would look
15   like?
16        A     When was the hurricane?
17        Q     The hurricane was in October of '05.
18        A     It would have been close.  It would have
19   been -- the decision was made for a new building, it
20   would have been for a large building, but can I tell
21   you that the Colton building was picked out -- I
22   think it was not, but I'm not sure.  I don't know if
23   we'd fine-tuned it to that point.
24        Q     As of the date of this e-mail, had you
25   received authority yet to begin the process of
```

877.955.3855

```
 1   putting up a new building?
 2       A    I don't recall.
 3       Q    Did Mr. -- first of all, was it
 4   Mr. Franklin who asked you for the information you
 5   provided?
 6       A    Either Will or Simon.  I'm not sure which.
 7       Q    Did either one of them explain why they
 8   asked you for this information?
 9       A    No.  Accounting doesn't explain too much
10   to me, and I try not to explain anything to them.
11   We're on different planets.
12       Q    Immediately after the hurricane, let's say
13   within the first month or so, were you asked to
14   provide to Mr. Rote or Mr. Franklin an estimate of
15   the repair or replacement costs?
16       A    I'm not sure, but if I had, there's an
17   e-mail chain.  You've probably got a copy of it.  I
18   did -- I did two e-mails that were in-depth like
19   this.  There's another one floating around.  And I
20   don't know how the dates jibe with your question.
21       Q    Okay.
22       A    But I wouldn't have shot from the hip with
23   something.  I would have given them something that
24   they could work with.
25            MR. RUBY:  This will be Exhibit 73.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

From: Simon Rote [/O=COPART/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=SEROTE]
Sent: Tuesday, July 31, 2007 2:09 PM
To: Heather Luck
Subject: FW: Facility #105 Hialeah; Hurricane Wilma 2005 destruction of office building

Simon Rote
VP of Finance
Copart Inc.
4665 Business Center Dr.
Fairfield, CA 94534
(707) 639-5009
(866) 418-6913 fax

---

From: Mike Carson
Sent: Monday, August 28, 2006 12:56 PM
To: Will Franklin; Simon Rote
Subject: Facility #105 Hialeah; Hurricane Wilma 2005 destruction of office building

At your request, I have researched the costs involved with the destruction of our offices at facility #105 Hialeah, Florida by Hurricane Wilma in 2005, and offer the following for your consideration:
1. The building that was destroyed was a "metal" building built with structurally engineered steel I-beam components enclosed by 24 gauge steel roofing and siding. The building was erected on a four foot thick elevated concrete slab and was originally designed to be a full size trucking terminal with corporate and dispatching offices. The total square footage of the structure was 8,700 square feet. We had just finished a complete gutting and refurbishing of the building approximately sixty (60) days prior to being destroyed by the hurricane.
2. Hurricane Wilma caused 70%-80% total structural devastation of the building, to the point that it was condemned by Miami-Dade County, and we received a thirty (30) day notice to "must demolish" the structure. I employed a structural engineer to evaluate the building, hoping to save the structure and perhaps rebuild it, but to no avail. The building was structurally unsound, and was totally demolished within an immediate time frame after receiving the demolition permit.
3. To start new construction of this sort of structure in the period prior to Hurricane Wilma, construction costs would have been approximately $ 115.00 per square foot in the Miami market. Since Wilma, costs have been inflated, and the present rate is $120.00 per square foot. This puts the pre-Wilma construction costs of this building at $ 1,000,500.00, and post-Wilma at $ 1,044,000.00. Bear in mind that these costs include a "standard" tenant office finish build out with interior demising walls, carpet/tile, doors and hardware, ceilings, lights, finished restrooms per Code, such that the project would be "turnkey" for the Owner or his tenant.
4. These costs do not include architectural or engineering fees, impact fees, miscellaneous fees and permit fees. Typical architectural fees might be $40,000-$50,000.00 for this building, and MEP engineering costs might run $20,000-$25,000.00. I cannot estimate the estimate fees Miami-Dade might require, but I would not be surprised to pay $25,000-$40,000.00. I would estimate permit fees to total $7,000-$10,000.00.
5. On another tact, IF the building had not been condemned and had not been structurally unsound, if we could have re-built the building utilizing the existing concrete slab, I can only theorize based on my examination of the destruction what it might have cost to rebuild and place the structure and the offices back into the condition that existed prior to Wilma's impact. Please understand that this is not a "hard" or "firm" estimate, because I took no bids to repair the damage before I demolished the building. I place a value on rebuilding the building, restoring structural integrity, drying it in, replacing all mechanical, electrical and plumbing systems, all fixtures and re-doing the just completed pre-Wilma construction at $95.00 per square foot, or approximately $ 826,500.00 to $ 850,000.00. My assumptions are that the concrete foundation would require minimal repair to the slab and the embeds for the steel columns, and that the original architect and manufacturer would be able to bring the older structure into conformity with the most recent BOCA building codes. These assumptions may not be practical, possible or valid; there is no way to validate them either way.
6. If we had been, in fact, able to repair and rebuild this building, and to do so in conformance with modern codes, we would still have to expense for approximately the same sums for architectural, engineering, miscellaneous, impact and permit fees.
   Let me know if I can provide any more information.   C



Confidential
CPT002140