# EXHIBIT A

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COPART, INC.,

    Plaintiff,

    vs.                          Case No.: C 07 02684 CW

CRUM & FORSTER INDEMNITY,
COMPANY, UNITED STATES FIRE
INSURANCE COMPANY, and
DOES 1-10,

    Defendants.

**CERTIFIED COPY**

---

AND RELATED COUNTERCLAIMS.

---

DEPOSITION OF PATRICE G. McINTYRE

San Francisco, California

Wednesday, May 14, 2008

Reported by:
DIANE M. GALLAGHER
RPR, CSR No. Michigan 2191

JOB No. 86976

877.955.3855
www.sarnoffcourt...
IRVINE • LAS VEGAS • LOS A... • SAN FRANCISCO

SARNOFF
Court Reporters and
Legal Technologies

```
 1        Q    With whom?
 2        A    Marsh.
 3        Q    Does Marsh now go by Marsh, Inc., is that its
 4   name?
 5        A    Here in California we go by Marsh Risk &
 6   Insurance Services.
 7        Q    How long have you been with Marsh?
 8        A    Since 1999.
 9        Q    What was your position when you joined Marsh in
10   1999?
11        A    Very close to what it is now.
12             MR. SHANAGHER:   He wants to know what that
13   position is.
14             THE WITNESS:   An account rep.
15        Q    (BY MR. RUBY)  How would you describe the
16   duties of an account rep?
17        A    I am involved in the day-to-day servicing and
18   the renewal cycle of an account.
19        Q    Does Marsh have a team approach to servicing
20   clients?
21        A    Yes.
22        Q    Were there other people at Marsh who assisted
23   you or with whom you worked on accounts?
24        A    It depends on the account and at the time,
25   depending on what time as to how many people might have
```

1  there?
2       A    I have a vague memory of it.
3       Q    What is your vague memory of it?
4       A    Of doing -- of going onto their Web site and
5  checking their facility list.
6       Q    Why did you do that -- I am sorry.
7       A    Ah, I think I was trying to reconcile the
8  locations.
9       Q    Were you trying --
10      A    Addresses as such.
11      Q    Were you trying to reconcile the information on
12  the Web site with the information in the Statement of
13  Values?
14      A    Most likely, but I don't know what version or
15  which date.
16      Q    Well, that's okay.  I wasn't asking about a
17  specific version, but I was just asking you if you can
18  confirm that the purpose of your looking at the
19  information on the Web site was related to the
20  preparation of the Statement of Values for the renewal?
21      A    I believe so.
22      Q    Take a look at Exhibit 15, please.  Okay,
23  Exhibit 15 is from the Marsh production previously
24  marked at Mr. Rote's deposition as a pair of e-mails,
25  one on the 8th of August, 2005, and another one on the

1  10th of August.
2         So, ma'am, I want to ask you first about the
3  August 8th e-mail.  Is that an e-mail from you to Mr.
4  Rote.
5     A   Yes.
6     Q   If you could just read that and then let me
7  know when you are finished and I will ask you some
8  questions about it.
9     A   Okay.
10    Q   First of all, does this e-mail refresh your
11 recollection as to why you looked at the facility list
12 on the Web site?
13    A   Yes, I think so.
14    Q   So what was the -- why was it that you looked
15 at the facility list on the Web site?
16    A   Because the inventory list that was provided
17 did not have physical address information, only yard
18 code numbers.
19    Q   Okay.  And based on looking at the inventory
20 values and then the Web site, you had some questions for
21 Mr. Rote?
22    A   Yes, I did.
23    Q   Now, one of your questions, which is bulleted
24 there, it says, Appears the 20 acres in yard 105 Hialeah
25 was developed and is now 11858 Northwest 36th, Miami,

49

1  Florida, question mark, question mark.
2       Do you see that?
3  A    Yes.
4  Q    Why did you pose that question to Mr. Rote?
5  A    In trying to update our schedule of locations
6  for the renewal and looking at the inventory list that
7  he had sent and then the facility list on the Web site,
8  I saw an address for yard code 105.
9  Q    Was it your suspicion that you were asking him
10 to confirm or correct that there had been some
11 development at yard 105?
12      MR. LARSON:  Vague and ambiguous.
13      MR. SHANAGHER:  Vague and ambiguous as to
14 suspicion.
15      THE WITNESS:  I did not know what had
16 transpired with these locations.
17 Q    (BY MR. RUBY)  Earlier when we looked at a
18 couple of statements of values from 2005, we saw that
19 there were two lines for yard 105.
20      Did you have a question at the time that you
21 wrote to Mr. Rote about whether there should be two
22 lines as opposed to one line?
23 A    Yes, uh-huh.
24 Q    Did Mr. Rote ever reply to you regarding the
25 questioning in your e-mail here about yard 105?

```
 1   moment ago?
 2       A    I believe so.
 3       Q    We looked at your e-mail to Mr. Wood soliciting
 4   his assistance.
 5            What assistance, if any, did he actually
 6   provide in connection with the 2005 renewal?
 7       A    He was the contact -- he provided the
 8   specifications to the underwriters at the various
 9   markets that we were approaching for proposals.
10       Q    Were you kept in the loop on which markets were
11   being approached?
12       A    I believe so.
13       Q    You used the word "markets" plural.  Was the
14   2005 renewal submitted to carriers other than US Fire?
15       A    I believe so.
16       Q    Do you know how many, roughly how many other
17   insurers were approached with respect to the 2005
18   renewal?
19       A    No.
20       Q    Okay.  So Mr. Wood has been doing his thing.
21            We will jump ahead in time now.  If you could
22   look at Exhibit 19 now, please.
23            MR. LARSON:  Objection to Mr. Wood "doing his
24   thing."
25       Q    (BY MR. RUBY)  Okay.  Ma'am, is Exhibit 19 an
```

60

1   you were not present if there was such a meeting?

2       A   Correct.

3       Q   Now, putting aside whether there was a meeting

4   and, if so, what was discussed, were you at any time

5   involved with Copart in making the decision on which of

6   the quotes would be accepted?

7       A   No.

8       Q   Is that something that Mr. Finigan in his

9   capacity as the client executive was typically involved

10  in?

11      A   Yes.

12      MR. RUBY:  Okay.  This would be a good time

13  for another break, and then we will try to wrap up a

14  little bit early for lunch, and then I may be done by

15  then.  I may not have a whole lot more.  We will take a

16  lunch break and then Mr. Larson will be asking probably

17  most of the questions after that.

18      So a short break now and then we will have

19  another break pretty soon for the lunch break.

20      (Short break taken from 11:05 a.m.

21      to 11:15 a.m.)

22      MR. RUBY:  Okay.  Back on the record.

23      Q   (BY MR. RUBY)  Ma'am, if you could look at

24  Exhibit 23, please.  Is this an e-mail from you to Ms.

25  Streacker in October of '05?

1  A   Yes.
2  Q   Now, this e-mail and the attached property
3  notice of loss concerns the Copart's Hurricane Wilma
4  claim.
5      How did you find out about the Hurricane Wilma
6  losses?
7  A   I don't recall how I heard, how I first heard
8  about them.
9  Q   Okay.  What was it, was there any particular
10 reason why you past notification to Miss Streacker of
11 the loss?
12 A   Normally I wouldn't notice.  I think I was
13 hoping -- I was trying to help.  Perhaps our property
14 claims person wasn't available.
15 Q   Yeah, that's kind of what I was getting at.
16     At the time of the loss, so October of '05, did
17 Marsh have people within the organization that serviced
18 claims on behalf of accounts?
19 A   Yeah, we have dedicated claim consultants.
20 Q   Do you know if at any time a dedicated claim
21 consultant at Marsh was assigned to Copart's Wilma
22 claims?
23 A   Yes.
24 Q   Okay.  Do you know who that was?
25 A   Yeah.  That would be Sherry Myers.

64

1   Compensation coverage, and that was Ernie Smith.
2       Q   What did you understand Monica Streacker's
3   position to be?
4       A   Underwriter.
5       Q   And had you ever dealt with her on any other
6   account other than Copart?
7       A   No.
8       Q   I believe you testified that you created the
9   template of the Statement of Values forms that we looked
10  at?
11      A   Uh-huh, yes.
12      Q   And that was true of at least for what was
13  Exhibit 3, the October 1, 2003 Statement of Values, is
14  that right?
15      A   I believe so, yes.
16      Q   Okay.  We also looked at other Statements of
17  Values over the ensuing years.  Were those templates
18  also created by you?
19          MR. SHANAGHER:  I will object.  Lacks
20  foundation that the templates were any different.
21          THE WITNESS:  I think it was the same going
22  forward.  From the time I created that template I think
23  we used that same template going forward.
24      Q   (BY MR. LARSON)  Was this a template you
25  created specifically for this Copart account, or was

76

1  that?
2      A   Yes.
3      Q   Did you change the template to take out the
4  word "limit" from the 2003 SOV to the 2004?
5      A   I don't recall changing it.
6      Q   Okay.  I believe you testified that Copart
7  would provide you with the values to put in the various
8  columns of the Statements of Values?
9      A   Yes.
10     Q   Let's talk, let's focus on building values for
11 the moment.
12         Did you, or anyone else at Marsh, give Copart
13 any instructions as to how they should go about
14 determining the values to put in the buildings column?
15         MR. RUBY:   Vague as to time.
16         MR. LARSON:   At any time over the course of
17 the account?
18         THE WITNESS:   I did not.
19     Q   (BY MR. LARSON)  To your knowledge, did anybody
20 at Marsh give such instructions?
21     A   I don't recall.
22     Q   Did anybody at USFIC or Crum & Forster give
23 instructions to Marsh as to the methodology to follow in
24 determining the values that would go into this Statement
25 of Values?

78

1   A   Not that I recall.
2   Q   Did Marsh ever give Copart any warning about
3   the consequences that would follow if they failed to
4   include a value for a building at a designated location?
5       MR. SHANAGHER:  Objection.  Vague and ambiguous
6   as to when.
7       MR. RUBY:   Join.
8       MR. LARSON:   Let me clarify before you answer.
9   Q   (BY MR. LARSON)  Did you give any description
10  of any consequences, particularly with regard to
11  coverage, that would follow if Copart did not put in a
12  value number for a particular location?
13  A   I do not recall doing so myself.
14  Q   Do you recall anybody at Marsh doing so?
15  A   I don't know.
16  Q   Do you know if anybody at Crum & Forster or
17  USFIC gave Copart any instructions or warnings or
18  descriptions of consequences that would follow,
19  especially with regard to coverage if they did not put
20  in a value in any of the columns for a designated
21  location?
22  A   I don't recall that, no.
23  Q   Do you recall if you or Marsh ever received any
24  complaints from USFIC or Crum & Forster that the Copart
25  Statement of Values was incomplete?

1  values are.

2      Q   Let's look at Exhibit 33.  That would be in

3  the book.  Were you aware that the 2004 to 2005 policy

4  was, in fact, endorsed at yard 105 as a location with

5  the Miami address?

6          MR. SHANAGHER:  Objection.  Vague and ambiguous

7  as to "endorsed" in this context.

8          THE WITNESS:  I am not aware of that, no.

9          MR. LARSON:  Let's mark this as next in order.

10         (Deposition Exhibit No. 48 was marked for

11         identification by the court reporter.)

12     Q   (BY MR. LARSON)  Marked as Exhibit 48 is the

13 2004 to 2005 policy.  If you look at, very close to the

14 end, Ms. McIntyre, page POL 0215?

15         MR. SHANAGHER:  Second to last, third to last

16 page.

17         THE WITNESS:  Okay.

18     Q   (BY MR. LARSON)  If you look at, which is a

19 Change Endorsement heading, change description, about

20 the middle of that box?

21     A   Yes.

22     Q   It says 11858 Northwest 36 Avenue, Miami,

23 Florida 33167.  Do you see that?

24     A   Yes, I see that.

25     Q   Okay.  And the effective date July 31, '05?

95

1   A   Yes.

2   Q   And before those list of addresses the
3   endorsement says, It is hereby agreed and understood
4   that the following locations are added.

5   A   I see that.

6   Q   So is it your understanding, your recollection
7   now, looking at this endorsement, that the yard 105 with
8   the physical street address was, in fact, added to the
9   2004-2005 policy?

10  A   Yes, I see now that it was.

11  Q   After the hurricane in October of 2005, I am
12  talking about now all of the property insurers you deal
13  with, did you find that property insurers after the
14  Hurricane Wilma and Hurricane Katrina started asking for
15  more information in Statement of Values forms and forms
16  of that ilk?

17      MR. RUBY:   Objection.  Vague as to "more."

18      THE WITNESS:  I don't recall that they did ask
19  for more information.  Carriers were concerned about
20  the location of risks because of wind.

21  Q   (BY MR. LARSON)  After October 2005, and after
22  Wilma and Katrina, did you get a sense, just based on
23  your experience in this industry, that property insurers
24  were placing a greater priority on the Statement of
25  Values and getting updated information?

96

1  don't, why would you send to some clients a form
2  requiring signature and to other clients send a form not
3  requiring a signature?
4     A    Copart's statement was very lengthy, so I know
5  that I used a different template for that.
6     Q    So the lengthy forms don't require signature,
7  is that what you are saying?
8     A    No, I am not saying that.
9     Q    Do you have an answer to --
10    A    I guess I don't have an answer.
11    Q    Okay.  I am not trying to give you a trick
12 question.  I am really just curious.
13        Among your clients during this time period, did
14 Copart have a large number of locations in relation to
15 your other clients?
16    A    Yes.
17    Q    Was it your account with the largest number of
18 locations?
19    A    Yes.
20    Q    And given the values and the Statement of
21 Values, was it your understanding that Copart was giving
22 you their best estimates as to the values of their
23 property?
24        MR. RUBY:  Vague and ambiguous.
25        THE WITNESS:  Yes.

101