# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COPART INC.,

      Plaintiff,

vs.                                        No. C 07 02684 CW

CRUM & FORSTER INDEMNITY
COMPANY, UNITED STATES FIRE
INSURANCE COMPANY, and DOES
1-10,

      Defendants.

# CERTIFIED COPY

_____

AND RELATED COUNTERCLAIMS.

_____

DEPOSITION OF MICHAEL W. CARSON

San Francisco, California

Tuesday, May 20, 2008

Reported by:
DARCY J. BROKAW
RPR, CRR, CLR, CSR No. 12584

Job No. 86979



877 955.3855
www.sarnoffcourtreporters.com

IRVINE ▪ LAS VEGAS ▪ LOS ANGELES ▪ SAN DIEGO ▪ SAN FRANCISCO

SARNOFF
Court Reporters and
Legal Technologies

1    going to start the deposition today by asking you

2    about various subjects, topics that were in the

3    Deposition Notice to the corporation, and I'll

4    assume, based on your designation, that you're the

5    most knowledgeable or that you're a knowledgeable

6    person to talk about those.

7          If at any time I ask you a question you

8    feel you're not qualified or knowledgeable to answer

9    the question, just let me know.

10         At the end of the day, I may circle back

11   and ask you some questions that are outside of the

12   subjects, but they may end up encompassing all of my

13   questions, so we'll see how it goes.

14         The first general area I want to ask you

15   about is the history of the Miami side of what is

16   considered Yard 105.  And we'll first be talking

17   about Copart's acquisition of the Miami property and

18   then what was there when Copart bought it.

19         MR. RUBY:  And we'll mark as Exhibit 51 a

20   photograph.

21                    (Defendant's Exhibit 51 marked

22                     for identification)

23   BY MR. RUBY:

24       Q   Mr. Carson, have you ever been to

25   Yard 105?

1    A    Yes.

2    Q    More than once?

3    A    Yes.

4    Q    Approximately how many times?

5    A    Perhaps 30, maybe 40.

6    Q    Okay.  Is Exhibit 51 a fair and accurate

7    photograph of at least part of what Copart calls

8    Yard 105?

9    A    Part.

10    Q    Okay.

11        All right.  There are some railroad tracks

12    in the photograph.

13        Do you see those?

14    A    Yes.

15    Q    And one of the tracks runs straight down

16    the picture from top to bottom.

17        Do you see that?

18    A    Yes.

19    Q    Okay.  Is that approximately where the

20    line is between the City of Hialeah and the City of

21    Miami?

22    A    I believe that to be the line, but I'm not

23    sure.

24    Q    All right.  Now, to the right of those

25    straight tracks, you see there's sort of a fence in

1    the shape of a quarter or a quadrant of a circle?

2        A    Yes.

3        Q    Is that property sort of bounded by that

4    fence part of Yard 105?

5        A    Yes.

6        Q    And there's a large building in the

7    photograph?

8        A    Yes.

9        Q    Now, in this photograph, it appears that

10   the roof has some damage.

11            Do you see that?

12       A    Yes.

13       Q    Is that some of the damage that was done

14   by Hurricane Wilma?

15       A    Partially.

16       Q    So prior to Hurricane Wilma, the roof was

17   in -- was not in that condition, correct?

18       A    Correct.

19       Q    Okay.  Now, then to the left of those

20   tracks that run down the picture, there's at least

21   part of another yard.

22            Do you see that?

23       A    It's the same yard.

24       Q    Okay.  To the left of the tracks, there's

25   another fence, correct?

1       A    Yes.

2       Q    And there's a small building in the upper

3  right-hand corner of that enclosed space?

4       A    Yes.

5       Q    Now, that fence, which we only see a part

6  of here, that encloses another area that's

7  considered part of Yard 105?

8       A    Yes.

9       Q    Were the two sides, that is, to the right

10  of the tracks and the left of the tracks, acquired

11  by Copart at the same time?

12      A    No.

13      Q    Which side was acquired first?

14      A    I didn't attend the closings, and I'm not

15  sure of the date.

16      Q    All right.

17           MR. RUBY:  I'll mark as Exhibit 52 this

18  contract for sale and purchase.

19                     (Defendant's Exhibit 52 marked

20                      for identification)

21  BY MR. RUBY:

22      Q    Mr. Carson, you can just take a moment to

23  leaf through the document and let me know when

24  you're finished.

25      A    I'm finished.

17

BY MR. RUBY:

    Q    Okay.  And this shows that the date of the deed was, in the first paragraph, "made this 31st day of May, 2002"?

    A    That's what it shows.

    Q    When was -- well, let me not -- what was your first involvement, if any, in the management of the Yard 105?

    MR. LARSON:  Vague and ambiguous as to "management."

BY MR. RUBY:

    Q    What was your first involvement of any kind with Yard 105?

    A    I flew in to visit the property before we -- before a contract to purchase the parcel to the west of the tracks, which would be the 20-odd acres situated in Hialeah that shows a small building on Exhibit 51.  I don't recall the date, but I flew in with my boss to look at the property to determine whether it could be developed for our purposes.

    Q    Okay.  Now, that visit to the site that would eventually become Yard 105, did that happen before Copart acquired the Miami parcel?

    A    To my knowledge, yes.  But again, I wasn't

1    involved in the contracts closings or conveyance of

2    the deeds.

3        Q    When you went that first time and looked

4    at the acreage in Hialeah, did you also inspect the

5    existing facility on the Miami side?

6        A    No.  At that time, that property wasn't on

7    the table for us, to my knowledge.

8        Q    Okay.  What was your first involvement,

9    then, with the Miami parcel?

10       A    Sometime after I visited the first time

11   the 20-some acres with my boss and the decision was

12   made to purchase the property, we set into motion

13   applications for approvals, of which I was part of

14   the process with the City of Hialeah on that piece.

15   During that approval process, I received a call from

16   my CEO telling me that the second piece, now shown

17   as the piece to the east of Miami-Dade, was going to

18   be on the table for us and that we were attempting

19   to buy it.

20       Q    Okay.  Prior -- well, let me ask you this:

21   When was the first time you ever toured or inspected

22   the Miami piece?

23       A    It was after I'd toured and inspected the

24   Hialeah piece, but I don't have dates.

25       Q    Were you asked to provide any comments on

1    the Miami piece before it was acquired?

2        A    Yes.

3            MR. LARSON:    Vague as to "comments."

4    BY MR. RUBY:

5        Q    What were you asked to comment upon?

6        A    I visited the property again with my --

7    with my boss.    We inspected it in the same manner as

8    the nature that we inspected the Hialeah piece to

9    determine the suitability of the development of the

10   property as part of a facility.

11       Q    Now, that first time that you inspected

12   the Miami piece, could you describe how the building

13   existed at that time?    Or what was the building at

14   that time?

15       A    The Miami piece had on it the pictured

16   damaged truck terminal in an undamaged state.    It

17   was operated by a tenant of the owner, called MCI

18   Express.    They were operating it as a truck

19   terminal, truck terminal or courier service.

20            I toured the property on the outside and

21   on the inside to determine the structure of the

22   building, the location of the offices, what kind of

23   shape they were in, examined the electrical panel,

24   things of that sort, to see if it could be

25   renovated.

1    Q    Can you describe what the interior space

2    was like?

3    A    Yeah, the interior office space was rough,

4    it was well worn, hadn't seen any cosmetic upgrades

5    in quite some time.  The bathrooms were dirty.  The

6    ceilings had a suspended grid ceiling; it was

7    tarnished from dirt, air flow, cigarette smoke.  The

8    floors were pretty beat up.  I don't recall -- I

9    think the carpets in the office were pretty bad.

10   All the walls -- not all the walls, but I remember

11   the old-type paneling, like the '60s type stuff.

12        And then back past the office, where the

13   office was developed, the back portion was actually

14   the truck depot portion of it, and that was pretty

15   messy.  But it was functional; it was being used as

16   a truck depot.

17   Q    Now, using the photograph as a reference

18   and just using sort of right, left, top, bottom, can

19   you tell me where in the building were the office

20   spaces?

21   A    On the Miami portion?

22   Q    Yes.

23   A    The office spaces were located to the east

24   end of the building, which would be to the right.

25   The building is configured to be long and narrow,

23

1    but at the very right end, there's almost like a

2    T-section going off to the north.  That T-section,

3    the entire portion below that and then proceeding

4    back to -- I can't really tell from this picture,

5    but someplace I'd say roughly a quarter back from

6    that front entrance, the front wall was all office

7    space.

8        Q    Then moving sort of left across the

9    photograph or west, from the offices, what were the

10   existing spaces at the time of your inspection?

11       A    There was one open area, used as a loading

12   platform for a truck terminal, concrete floors,

13   metal building, standard metal building

14   installation, fluorescent lights.

15           MR. LARSON:  Try to keep your hand away

16   from your mouth.

17           THE WITNESS:  Sorry.

18   BY MR. RUBY:

19       Q    Okay.  With respect, then, to development

20   of the truck depot building, what ultimately became

21   Copart's plan?

22       A    Our plan was to renovate, renovate the

23   building and make it into modern usable office

24   spaces.

25       Q    When was it in time that Copart adopted

MICHAEL W. CARSON                          05/20/08

1    that plan?

2            MR. LARSON:   Vague as to "adopted."

3            You can answer, if you can.

4            THE WITNESS:   It was -- the plan was

5    adopted when my CEO and I visited to determine the

6    feasibility of developing the property, acquiring

7    it.

8    BY MR. RUBY:

9        Q    So during that first inspection by you and

10   the CEO, you decided at that time that it would be

11   feasible to renovate?

12       A    Yes.

13       Q    Now, we've looked at a warranty deed from

14   May of 2002.  When in relation to May of 2002, to

15   the best of your recollection, did you first inspect

16   the Miami piece?

17       A    Mr. Ruby, I have to tell you that I'm very

18   bad with the dates here.  At any given time, I have

19   anywhere -- at this particular time, I might have

20   had as many as 30 construction projects going.  Even

21   now, I've got somewhere in the neighborhood of 20.

22   And this was just another property for me.  It had

23   no special significance for visits in and out.  So I

24   really couldn't tell you with any certainty about

25   any dates.

1      The best I can tell you is I went there, I

2  did this and it might have been around this time,

3  but I can't tell you positively.  If you need

4  definite dates, I can go back and check my expense

5  reports and tell you that, yes, I was there this

6  weekend, and that's probably what I did.

7      Q    Could you narrow it down even to a year

8  when you first saw the Miami piece, or first went to

9  inspect it with your CEO?

10      A    I would say based on the contract for the

11  property being January 15th, 2002, it was probably

12  late 2001.

13      Q    So this first inspection with your CEO to

14  determine the suitability of the site for

15  development, this was before Copart had committed to

16  buying the property?

17      A    I would say, yes, that would be my belief.

18  Normally, we don't buy properties unless the CEO and

19  I go look at it.

20      Q    At any time prior to the renovating of the

21  building, were you asked by anyone at Copart to try

22  to put a value on the existing building?

23      A    Before we purchased it?

24      Q    Well, let's start there.

25           Before the building was purchased, were

26

1    hole so it's uniform.  It's minor cosmetic work.

2        Q    Was the foundation raised for the

3    renovations?

4        A    R-a-z-e-d or r-a-i-s-e-d?

5        Q    R-a-i-s-e-d.

6        A    No.

7        Q    So the preexisting concrete foundation was

8    kept but simply repaired?

9        A    Yes.

10        Q    Okay.  And the steel framing materials,

11    distinguishing that from the sheet metal but the

12    steel frame, was that maintained, as well?

13        A    We didn't have to do anything to it.

14        Q    Apart from the existing foundation which

15    was retained and the existing metal framing which

16    was retained, was the rest of the building

17    essentially a new building at the end of the

18    renovations?

19        A    Very close.  The interior was all new.

20    The exterior was -- I can't remember if we did the

21    entire building or not.  There was significant

22    resheeting going on.  It appeared to be a new

23    building, if it wasn't in fact new.

24        Q    How much did the -- what was the total

25    bill for the renovations of the truck depot?

38

MICHAEL W. CARSON                                    05/20/08

1        A    I don't recall.

2        Q    Do you have any estimate whatsoever you

3   can give me?

4        A    I don't recall.  Not to be obtuse.  This

5   is just many jobs past.

6        Q    Were the renovations complete before the

7   hurricane struck?

8        A    Yes.

9        Q    Had Copart started using the Miami piece

10  of Yard 105 prior to the hurricane?

11       A    Yes.  The facility was completed and was

12  taken over by our operations people, and the yard

13  was open and being utilized for business.

14       Q    Was there any sort of official opening

15  date for the Miami piece?

16       A    I wasn't involved in it.  I just do the

17  construction.  When I'm done, I turn it over to the

18  office; here it is.

19       Q    On to the next project?

20       A    That's it.

21       Q    Okay.  Can you give me any approximation

22  in time as to when the renovations were completed?

23       A    2006.

24       Q    Now, as I told you at the beginning, I

25  know -- you know I'm not good with dates either, so

MICHAEL W. CARSON

1    I'm going to help you out whenever I can.

2        The hurricane was in October of 2005.

3        A    We would have been totally complete and

4    turned over to ops at least is 60 days prior to the

5    hurricane.  My turnover to ops is not an opening

6    date.  My turnover means construction is complete,

7    the building is operational, we have heat, power,

8    water, air conditioning.  They -- other departments

9    of our company are responsible for putting in the

10   cubicles, the copy machines, the telephone lines,

11   the computers.  Usually that happens from 7 to 15

12   days after I'm complete.

13       Q    Okay.  Were you involved to any extent in

14   the permitting process for the renovations for

15   Yard 105?

16       A    Yes.

17       Q    What was the nature of your involvement?

18       A    I was involved in the whole approval

19   process, going before the planning and zoning

20   commission and the city council and the mayor to

21   seek initial approval of the use of the property for

22   our -- for our use to ensure proper zoning, to

23   satisfy the conditions put upon us by planning and

24   zoning to be able to obtain the permits and licenses

25   that we could move forward with.  And I attended at

40

1      Q    All right.  If we could go back to that

2  photograph which was the first exhibit that we       .

3  marked today.  It's 51.

4      A    Yes.

5      Q    Using that exhibit as a reference, sir,

6  can you tell me first with respect to the truck

7  depot building, what was the damage that you

8  observed?

9      A    It was a lot more significant than this

10  picture shows.

11      Q    Okay.

12      A    The roof damage shown in this picture was

13  taken from an aerial of about 1,500 feet, and you

14  can obviously see where the wind shear has taken

15  back sections of the roof.  What you can't see on

16  the roof at that time was that there was a large

17  portion of this roof that had become unsecured.  The

18  fasteners had ripped out of the rafters and purlins

19  and actually were blowing in the wind, which in this

20  picture, you can't see that.  It's a flat portrait

21  down.

22           There was extensive water damage in the

23  offices.  Walls, brand-new drywall walls were

24  soaked.  The T-grid ceilings in many places had

25  fallen through because of water and wind damages.

120

1   The carpets were soaked.  The new cubicles and new

2   furniture was ruined.  Ceiling insulation from above

3   the T-grid ceiling had soaked, entirely soaked

4   through and fallen through, and just pretty well

5   saturated a lot of things.

6           We had wind damage that had blown around a

7   lot of the -- the overhead doors in the back of the

8   building on both sides had actually been sheared off

9   horizontally as if someone had come in with some

10  pneumatic shears and sheared the doors off.  Some of

11  the doors had -- they were coiling doors; they were

12  actually blown in and off.

13          There were vehicles stored inside the

14  storage part of this truck depot building.  Some of

15  them were high-dollar cars.  They had been damaged

16  by flying debris.  There were on the north side of

17  the building, approximately right here,

18  three-quarters of the way down the building,

19  approximately right here on the inside of that fence

20  were two brand-new Volvo L90D or L90E loaders used

21  to transport the vehicles.  They cost about 125-,

22  130,000 bucks each.  They had damage from flying

23  debris, hurricane debris, both of those.  There were

24  several cars out in this storage area that were

25  damaged by debris and moved around.

121

1        On the south side of the building, forward

2   of the last, east-most overhead door, that entire

3   wall section from that overhead door to where you

4   see the blue trim above the office section, that

5   entire wall section had been destabilized through

6   the violence of the hurricane.  The embeds that were

7   in the -- in the concrete foundation had been torn

8   out such that there were cars actually parked there,

9   and I made the people, after examining the building,

10  move those cars.  So I was pretty sure that wall was

11  coming down.

12        I don't know the date of this picture, but

13  I see the cars are parked there again.  I don't know

14  why the cars were there, but they were told to move

15  them.

16        We had windows shattered, materials that

17  had been stored in here for beginning the cars --

18  when a car is damaged, you wrap the car in

19  shrinkwrap, the high-dollar cars, and that was blown

20  all over.  There was debris all over.

21        The only thing that wasn't damaged was the

22  fence, because it was engineered to 167 miles an

23  hour.  The building was in pretty bad shape.

24      Q      Okay.  Did you solicit an engineering

25  report from a Walter Lewis?

122

1    Q    Okay.  I realize this may have changed

2   over time, so we're just going to take it from

3   beginning to end.

4        At the beginning of the aftermath of the

5   hurricane, what initially was Copart's plan, if

6   anything, for repairing or replacing the building?

7    A    Once Wilma had hit, I received a call from

8   my CEO, telling me to get down there as fast as I

9   could to determine how bad the damage was and to

10  give him an analysis of the damage on the whole

11  facility and also our Opa-Locka office facility.

12  Opa-Locka had roof damage and water damage but

13  nothing as severe as this.

14       I went down, I investigated this, I called

15  Willis, my CEO, my boss, told them what I had, I

16  told them at the time that I was visiting -- and

17  this was right after the hurricane -- I was unable

18  to determine without further work or moving things,

19  looking at things, inspecting things, testing

20  things, if the building could be saved, but my gut

21  reaction was that it could.  I asked him if I could

22  then hire a professional engineer, a structural

23  engineer to come in and validate or invalidate what

24  I thought about the building.

25       I hired Walter Lewis under the

1    recommendation of Kimley-Horn, which had been our

2    engineers nationwide.   They had an office in the

3    area, had done work there.

4          Walter Lewis came in, gave me this report;

5    I got it, I forwarded it on to my boss.   He said,

6    what's it going to cost to fix?   And I don't

7    remember the number.   The number was somewhere --

8    somewhere around 825- to 850,000 bucks, in my best

9    guess at the time, without any real doing any

10   further analysis on it.   He said, do what you have

11   to do and let me know.

12         I got on a plane, whichever day that was.

13   It was towards the end of the week, Friday or

14   Saturday.   I went home, I got a call, I think on my

15   voicemail.   Friday night, before I got home, or

16   Saturday or Monday, I got a call from Mike Fadhel,

17   the general manager, and Dan Hamlin, the regional,

18   and they both called me and said that Miami-Dade

19   Building Department had been in and condemned the

20   building and put up do-not-enter signs, condemned

21   building, blah, blah, blah, blah, blah.

22         I went down there, got back on a plane,

23   went back down there, talked to Miami-Dade, and they

24   basically said, the building is condemned, it's got

25   to come down; you've got 30 days from the date we

1    plastered on the door to take the building down.  I

2    reported this to my boss.  He said, do we have

3    options?  I said no.

4              I called TBT, because they had just

5    finished this building within a matter of weeks, and

6    said, get down here, pull a demo permit, take the

7    building down, I want it down in 30 days, I don't

8    want any hassle with Miami-Dade.

9              I believe that Russell Couvian,

10   C-o-u-v-i-a-n, and Trey Rogillio, R-o-g-i-l-l-i-o,

11   from TBT flew down the next day.  They met me on the

12   site, we went through it.  I said, take it down,

13   whatever it costs, take it down.  Russell Couvian

14   went to Miami-Dade Building Department to pull a

15   demolition permit.

16             They wouldn't give it to him.  They were

17   swamped.  I mean, they had so much damage there that

18   they were just swamped.  He was there for, I don't

19   know, approximately three to four weeks, basically

20   hounding the building department to get the demol

21   permit, because I was hounding him.

22             We had 30 days, we had a set date it had

23   to be down by.  It turned out we got the building

24   demolition permit, I don't know the actual dates,

25   but it was quite some time later.  It could have

1   been two months later that we actually got the

2   building permit, the demolition permit to take the

3   building down.  When we got the permit, they were on

4   it the next day, taking it down.

5           So any rehabilitation or repair or

6   rebuilding of this building was foreclosed as an

7   option to us by the actions of Miami-Dade, and those

8   actions were not appealable.

9           MR. RUBY:  This will be 69.

10              (Defendant's Exhibit 69 marked

11              for identification)

12  BY MR. RUBY:

13      Q    Sir, is Exhibit 69 the invoice you

14  received from TBT for the -- first of all, for some

15  salvage expenses?

16      A    It's a copy of it, yes.

17      Q    Okay.  We're going to see, I think, more

18  than one salvage invoice, but let me ask you:  What

19  salvage work did TBT do?

20      A    They entered the building and tried to

21  salvage any equipment that was salvageable.  I think

22  they got the switch box -- the switch box,

23  electrical box, main electrical panel box.  They got

24  the outside heat pumps, which on Exhibit 51 would

25  have been on the north side, right about where that

130

1    the elements, try to salvage whatever you can,

2    particularly the high-dollar things, like the

3    breaker box, which is high buck, and then whatever

4    else you can salvage that might be reused.

5          And then the second thing is actually

6    doing the heavy work and getting the stuff down

7    safely and out of there.

8          That's all I remember.  I mean, if there's

9    another ancillary invoice for a few thousand bucks,

10   it's possible, but that's pretty much it.

11        Q    Once the building came down because of the

12   condemnation order, what then became the plan, if

13   any, for the restoration of operations at the site?

14        A    Okay.  This is pretty much simultaneous

15   with the 48-hour 72-hour period after I hit the

16   property, after Wilma, I was also doing this.  The

17   first imperative was, one, safety of our people and

18   our customers; and that involved analysis of this

19   building and what would happen with it.

20        The second imperative was to get us back

21   up and get open as soon as we could, because it's

22   now a catastrophe area and you're going to have

23   thousands and thousands of claims of all kinds.  So

24   I brought in these two rent-a-trailers and had them

25   placed on the site.  This trailer was -- they were

1  actually side by side.

2          You know what, there might have been three

3  trailers.  I can't -- I don't have the memory of

4  this, but there were these two and there might have

5  been a third one.  There might have been a third

6  trailer.  I'm not sure about that, Mr. Ruby, but at

7  least two, and I think -- they were put in like

8  this.  One -- two of them were for just insurance

9  company adjusters to come in, and the other was for

10  our office.  And if I'm mistaken about the three,

11  then I'm mistaken, but there were at least two.

12          I got those, expedited them, because we

13  had a national account with the leasing company, and

14  they brought them in from out of state because there

15  were no trailers, no emergency trailers.  They

16  brought them in, and then it was pretty much a lot

17  of elbows.  We had to get them hooked up; we had to

18  run power.  In fact, you can see the trench right

19  there, running power to these from the old building.

20  We ran the power here, and we ran from here to the

21  street sewer and hooked them up to get them going.

22          Once I got them up and operating, we had

23  MIS people come in, because the whole operation runs

24  off computer and phone.  We had those people come in

25  and try to interface with the telephone, had the

1    telephone company to get the phone systems, get the

2    computer systems up, things of that sort.  So I had

3    electricians, plumbers, and I had trailer people in

4    here doing that kind of stuff.

5            We didn't permit -- we were right in the

6    middle of the fiasco with the people in Miami-Dade,

7    trying to get the demolition permit, so I just

8    said -- I said forget it, just put the trailers in

9    and get them hooked up, and we'll fight the

10   rear-guard action for permits for power, sewer,

11   stuff like that.

12           We got them in, and then the next plan was

13   to attempt to rebuild the building.  Our option

14   to -- to put the new building.  Our option to

15   rebuild was closed by the condemnation.  To realign

16   this yard and put a new building in, I don't -- I

17   don't have that authority within my purview.  My

18   boss has to come in with me and physically walk the

19   property.  We have to look and do some measurements

20   on the ground and say what new building are we going

21   to put in and where would it fit and how many feet

22   do we have from here to here, where is the parking

23   going to be, where is our drop lock going to be,

24   just operational type of things that affect how we

25   put the property back together.  He wasn't able to

140

1    come right away.  I don't remember when he did come.

2    It was sometime.

3          In the meantime, I guess we were getting

4    complaints about these temporary modulars, and a few

5    months went by, and the decision was made to buy a

6    double-wide modular and put it in there, because we

7    knew by the time we got the site oriented and

8    located to put up a new building, by the time we

9    designed the new building internally, by the time we

10   went to an architect and an engineer and did all of

11   the drawings and did the back and forth with that,

12   and then by the time we made application to go

13   through the approval process and go through each and

14   every one of the departments, it would probably be a

15   couple of years.

16          This is not a situation where you walk

17   into Miami-Dade and say, here, here's my drawings

18   and I need a building permit in six weeks.  What

19   happens there is an architect draws it, it comes

20   back to me for markup, there are all the drawings,

21   the drawings go to my boss, he fine-tunes things; we

22   send them back to him, we go through that process.

23   The building itself has to be engineered by the

24   metal building company.  They have to do actual

25   engineering for wind load, deflection, all kinds of

1    that you have from TBT?

2           A    Yes.

3           Q    Is it based on the plans that have been

4    developed by Mr. Liven?

5           A    Yes.

6           Q    Has Copart -- let me back up.

7                Is this an estimate that you requested for

8    informational purposes, or is this an estimate that

9    you solicited as something you may actually sign off

10   on?

11          A    I'm in the process of building the

12   building now.  We're going through the approval

13   process.  It's my intent to negotiate a contract

14   with TBT.  So to know if we even have any common

15   ground, I had to first get a firmer price from them

16   based on the most current drawings from Dov Liven.

17   If the number had been astronomical, we'd have no

18   common ground to talk.  But I had to have a number

19   based upon those drawings.

20               So they gave me this number, and I went

21   through the exercise, coupled with the number I got

22   from my architect, who's a knowledgeable source,

23   although he's not a construction guy, and then I did

24   some Means work based on current Means estimates per

25   square footage in Miami-Dade, Florida, of my own,

173

1    and then I did an analysis, which would be Exhibit

2    80, to see where my guys are on this and to see what

3    this project is going to really cost me.

4           And this really has got nothing to do with

5    the insurance claim from my end.  This is my work

6    product for my new building that I'm building.  It

7    may affect what we're doing, but that's what I was

8    doing it for.

9           Q    This estimate or this document which is

10   Exhibit 75, do you consider this to be now a quote

11   from TBT?  In other words, they're offering to do

12   the work for this price?  Or is this some sort of

13   preliminary document, and the number could still go

14   up?

15          A    The number won't go up.

16          Q    Okay.

17          A    I think it's a workable number, but it's a

18   sales number, too, a little bit.  It's reasonably

19   close, so we have common ground.  But if I go in to

20   buy a Mercedes and the salesman says 80 and I say

21   60, then at some point between 80 and 60, we're

22   going to come to an agreement.

23          So what I was doing was verifying their

24   square-foot price using independent other means to

25   do that.  So yes, it's a realistic semi bid, prebid,

174

1    pile.

2           Okay.  CPT90 is a purchase order by

3    Copart, and it's described as a purchase order for

4    "repairs to damaged shop."  And if we look at the

5    next document, which is CPT91, that appears to be

6    the invoice from TBT.

7           So are these two documents, 90 and 91,

8    relating to repairs to the building on the Hialeah

9    property?

10      A    Yes, the 50-by-20 shed.  Cosmetic damage,

11   no structural damage.

12      Q    We haven't talked about that damage.  But

13   in addition to the hurricane damage to the truck

14   depot, there was some damage to the Hialeah shed?

15      A    Yes.  It's shown in your picture, on

16   Exhibit 51.

17      Q    Is it?

18      A    Yeah.  And again, this is a flat lookdown.

19   You can see the roof.

20      Q    Okay.

21      A    See that?

22      Q    Yes.

23      A    And you see that there?

24          The damage was the wind was prevalently

25   from the west, and you can see damage like this, the

1    wind got under the EIFS and pulled off that roof.

2    It also peeled off vertical sheet metal on this and

3    damaged the overhead doors, like it did over here.

4         Q    All right.  So I want to make a new pile

5    for that.  We'll call it the Hialeah building.  And

6    if you could put 90 and 91 in that pile.

7         Okay.  Exhibit -- or page 92, Central

8    States Construction Company, billed to Mike Carson.

9    What is this for?

10        A    On initial, without checking into it

11   thoroughly, I had hurricane damage on the fence.  It

12   wasn't significant.  10 grand is minor.  But I had

13   damage to the gates and things like that, and they

14   had to be repaired or replaced.  And again, this is

15   the white panel metal fence; and it's an engineered

16   fence, it's not simply a slap-up white metal panel

17   fence.  It's an engineered fence.

18        But this really was nominal.  I forgot

19   about this.  This was nominal damage.  This was

20   nothing.

21        Q    Can you show me in Exhibit 51 where the

22   damage was to the gates for the fence?

23        A    I don't think there's a snowball's chance

24   in hell I can show you.

25        Q    Can you show me the general vicinity?

1      A      You got me cold there on that one.  I've

2  got to stop and think.  And we can check real quick,

3  but I think on the original office renovation plans

4  that you have a copy of, I think -- and again,

5  Mr. Ruby, this is many, many jobs ago.  I think that

6  this little wing part of the "T"; I think that was

7  designated for insurance people.  If you can pull

8  out those plans, I'm pretty sure that that's what

9  that was for, but I'm not positive.

10     Q      Let me make sure I've got the right plans.

11     A      No.  You need the one that had the MADFIS,

12  the architects on it.

13     Q      Did we mark that as an exhibit?  Maybe you

14  have it here.

15          MR. LARSON:  54.

16  BY MR. RUBY:

17     Q      So looking at Exhibit 54 --

18     A      Yes.  Okay, here.  This is that "T" part

19  of the building.

20     Q      Right.

21     A      Insurance offices.  So you would have had

22  the adjusters in there.  How many, I don't know.

23     Q      Okay.

24          All right.  Now, the decision to -- well,

25  first of all, as I understand your testimony, the

231

MICHAEL W. CARSON                              05/20/08

1   double-wide trailer was purchased to replace the

2   single-wide trailers?

3        A    Well, they were non-permitted,

4   non-allowed, illegal trailers.  We stuck them in

5   there on an emergency basis after the hurricane

6   because we had to operate.  So I think I testified

7   we stuck them in there.  I said, don't go down

8   there, don't get permits; stick them in there, let's

9   get them hooked up, and we'll fight a rear-guard

10  action if we have to.  We did that.  My memory is

11  three, it may have been.

12       But at some point, we're just packed

13  because you're taking all the people out of there

14  and here, and these are pretty much intolerable

15  conditions.  You have an air conditioning unit that

16  comes with a single-wide trailer versus a heavy-duty

17  BTU HVAC air conditioning system.  And now they're

18  stuck with a one-row and crap single-wide, old air

19  conditioning, and this is Miami, Florida; it's very

20  uncomfortable.  There's no room, and there's not

21  enough room for the people.  That's why we brought

22  the double-wide in.

23       Even now, it's probably on me because of

24  the delays, and I get blamed for not having the

25  building done, but even now, the double-wide is

232

MICHAEL W. CARSON                    05/20/08

1    packed and it's way too small.

2        Q    So the single-wides have been sent back,

3    right?

4        A    No.  Yes.  There's one for sure left.  And

5    I think it's being used as insurance offices.

6    Because there's no room in the double-wide for any

7    insurance people.  There's no room for nothing.

8        Q    At the time Copart ordered the double-wide

9    trailer -- we saw it earlier, a February '06

10   delivery -- at that point in time, February of '06,

11   when that was ordered, how long were you

12   anticipating it would be before a new building was

13   up?

14       A    Two years.  It sucks down there.  The

15   approval process sucks.  And if I pulled every magic

16   string I've got, it's still going to be two years.

17   It doesn't matter who it is or what kind of building

18   it is.  They're just tough.

19            It's the same thing here in this city.  If

20   that building right over there came down from an

21   earthquake, you've got a natural catastrophe, your

22   building department is swamped now, try to go back

23   in San Francisco and go through planning and zoning

24   and go through the building department and rebuild

25   that building and talk about anything less than that

233