1  ᶦJess B. Millikan, SBN 095540
   Samuel H. Ruby, SBN 191091
2  Judith A. Whitehouse, SBN 198176
   Bullivant Houser Bailey PC
3  601 California Street, Suite 1800
   San Francisco, California 94108
4  Telephone: 415.352.2700
   Facsimile: 415.352.2701
5  jess.millikan@bullivant.com
   samuel.ruby@bullivant.com
6  judith.whitehouse@bullivant.com

7  Attorneys for Defendant
   United States Fire Insurance Company

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

OAKLAND DIVISION

11

| | |
|---|---|
| 12  COPART INC., | Case No.: C 07 2684 CW (EDL) |
| 13              Plaintiff, | **UNITED STATES FIRE INSURANCE COMPANY'S:** |
| 14       vs. | |
| 15  CRUM & FORSTER INDEMNITY COMPANY¹, UNITED STATES FIRE INSURANCE COMPANY, and DOES 1-10, | **(1) MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT; AND** |
| 16  | **(2) OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON US FIRE'S COUNTERCLAIM** |
| 17              Defendants. | |
| 18  | |
| 19  | Date:     August 21, 2008<br>Time:     2:00 p.m. |
| 20  | |
| 21  | Action File:     March 20, 2007<br>Trial Date:      November 10, 2008 |
| 22  AND RELATED COUNTERCLAIM | |

23

24

25

26

27

28
_____
¹ Dismissed by Order Upon Stipulation (6/15/07).

1

# TABLE OF CONTENTS

2  I. NOTICE OF MOTION AND MOTION ..................................................................................1

3  II. INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................1

   III. FACTS ...............................................................................................................................2
4
       A.  Yard 105 ....................................................................................................................2
5
       B.  The US Fire Policy ...................................................................................................3

6      C.  The "Schedule On File" With US Fire ..................................................................4

       D.  The Claim .................................................................................................................6
7
   IV. ARGUMENT .....................................................................................................................7
8
       A.  Copart's Claim For Breach Of Contract Fails As A Matter Of Law .............7
9
           1.  The Buildings At Yard 105 Are Not Covered Property .......................7

10         2.  Copart's Concealment Of The Buildings' Existence And Values
               Voids Any Coverage That Would Otherwise Be Available For Yard
11             105      .......................................................................................................13

12     B.  Copart's Claim For Bad Faith Fails As A Matter Of Law .............................20

       C.  If Not Moot, US Fire's Counterclaim For Reformation Presents Triable
13         Issues Of Fact .......................................................................................................20

14         1.  Whether There Was A Mistake .............................................................21

           2.  Whether The Mistake Was Mutual .......................................................22
15
           3.  Whether, If The Mistake Was Unilateral, Marsh Knew Or Suspected
16             The Mistake ............................................................................................22

       D.  US Fire's Counterclaim For Negligent Misrepresentation Presents Triable
17         Issues Of Fact .......................................................................................................23

18         1.  US Fire Was Entitled To Rely On Copart's Representations ...........23

           2.  US Fire Was Damaged ...........................................................................24
19
   V. CONCLUSION ...............................................................................................................25

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

American Building Maintenance Co. v. Indemnity Ins. Co. of North America,
   214 Cal. 608 (1932)..............................................................................20, 21

Binder v. Aetna Life Ins. Co.,
   75 Cal. App. 4th 832 (1999)................................................................. 10

Crestview Cemetery Ass'n v. Dieden,
   54 Cal. 2d 744 (1960)......................................................................... 10

De Campos v. State Compensation Insurance Fund,
   122 Cal. App. 2d 519 (1954)..........................................................2, 14, 24

Designcraft Jewel Industries, Inc. v. St. Paul Fire & Marine Ins. Co.,
   399 N.Y.S.2d 225 (1977) ..................................................................... 14

Filippo Industries, Inc. v. Sun Ins. Co. of New York,
   35 Cal. App. 4th 1728 (1995)............................................................... 10

Franceschi v. American Motorists Ins. Co.,
   852 F.2d 1217 (9th Cir. 1988)............................................................... 20

Guebara v. Allstate Ins. Co.,
   237 F.3d 987 (9th Cir. 2001)..............................................................2, 20

Hibdon v. Truck Ins. Exchange,
   657 P.2d 1358 (Utah 1983) .................................................................. 5

Lunsford v. American Guarantee & Liability Ins. Co.,
   18 F.3d 653 (9th Cir. 1994)................................................................. 20

Mitchell v. United National Ins. Co.,
   127 Cal. App. 4th 457 (2005)..............................................15, 16, 17, 23, 24

Robinson v. Occidental Life Ins. Co.,
   131 Cal. App. 2d 581 (1955)................................................................. 19

Sony Computer Entertainment America Inc. v. American Home Assur. Co.,
   --- F.3d ---, 2008 WL 2736012 (9th Cir. 2008)..........................................1, 7, 8

Waller v. Truck Ins. Exch.,
   11 Cal. 4th 1 (1994)........................................................................2, 20

Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.,
   64 Cal. App. 3d 261 (1976).................................................................. 14

1

**STATUTES**

2

Cal. Civil Code § 3399:..........................................................................................................20

3

Cal. Ins. Code § 330 ................................................................................................................14

4

Cal. Ins. Code § 331 ................................................................................................................14

5

Cal. Ins. Code § 332 ................................................................................................................14

6

Cal. Ins. Code § 334 ....................................................................................................15, 16, 17

7

Cal. Ins. Code §§ 351-361 .......................................................................................................23

8

Cal. Ins. Code § 382.5(b) ...........................................................................................................5

9

California Insurance Code §§ 330-32 ........................................................................................2

10

§ 3399 ................................................................................................................................20, 21

11

12

13

**OTHER AUTHORITIES**

14

Rule 30(b)(6) ........................................................................................................................9, 17

15

Rule 56 ........................................................................................................................................1

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# I. <u>NOTICE OF MOTION AND MOTION</u>

2

<u>To The Court, All Parties, And Their Attorneys Of Record:</u>

3       Please take notice that on August 21, 2008 at 2:00 p.m. in Courtroom 2 of this Court, 4th

4 Floor, 1301 Clay Street, Oakland, California, defendant United States Fire Insurance Company

5 ("US Fire") shall and hereby does move pursuant to Rule 56 for summary judgment in its favor

6 on plaintiff Copart, Inc.'s complaint and all causes of action alleged therein, on the grounds that

7 said causes of action fail as a matter of law. This motion is supported by the Declaration of

8 Samuel Ruby and the Declaration of Monica Streacker, together with select portions of the

9 Declarations of Rick Larson submitted with Copart's cross-motion, the pleadings and other

10 documents on file with the Court, and the following memorandum of points and authorities. US

11 Fire seeks relief in the form of the proposed order lodged herewith.

12

# II. <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

13       Copart wants something for nothing. Prior to Hurricane Wilma, Copart never disclosed

14 to US Fire the existence of the buildings at Yard 105, never reported the value of those

15 buildings, and thus, never paid a *premium* for them to be covered. Yet now, Copart seeks to

16 collect from US Fire over $1.5 million in alleged losses at Yard 105 caused by the hurricane.

17 And the excuse Copart offers for not disclosing the buildings and their value before the loss—

18 that allegedly, the buildings were not being used before the hurricane—is neither relevant *nor*

19 *even true.*

20       Copart's breach of contract claim should be dismissed because Copart cannot meet its

21 burden of proving that the buildings at Yard 105 are "Covered Property." The buildings are not

22 "Covered Property" because they are not "described" in the statement of values incorporated by

23 reference into the policy's declarations. Glossing over that issue, Copart argues that nothing in

24 the policy "excludes" or "limits" coverage for Yard 105. However, because the buildings at

25 Yard 105 are not covered to begin with, US Fire does not have to prove that an exclusion or

26 limitation applies. <u>Sony Computer Entertainment America Inc. v. American Home Assur. Co.</u>, -

27 -- F.3d ---, 2008 WL 2736012 (9th Cir. 2008).

28

1   In the alternative, Copart's breach of contract claim should be dismissed because US

2   Fire has a complete affirmative defense to liability under California insurance law. Even if

3   somehow irrelevant to the determination of what is "Covered Property," Copart's statements of

4   values were certainly relevant to the *premiums* charged for the policies. Copart's failure to

5   disclose the existence and value of the Yard 105 buildings constitutes "concealment" under

6   California Insurance Code §§ 330-32. Concealment or misrepresentation is a complete

7   affirmative defense to an action on a claim under an insurance policy. E.g., De Campos v. State

8   Compensation Insurance Fund, 122 Cal. App. 2d 519, 527 (1954).

9   Copart's tort claim for breach of the implied covenant of good faith and fair dealing (i.e.,

10  "bad faith") should also be dismissed. For one thing, no policy benefits are due. See Waller v.

11  Truck Ins. Exch., 11 Cal. 4th 1, 35-36 (1994) (dismissing bad faith claim where there was no

12  valid breach of contract claim). Moreover, even if US Fire's coverage position is somehow

13  incorrect, it is at least reasonable. Given that there is a genuine dispute, US Fire cannot be liable

14  in tort. Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001).

15  Copart has filed a cross-motion for summary judgment on US Fire's counterclaims. US

16  Fire's counterclaim for reformation will be moot if the Court dismisses Copart's claim for

17  breach of contract; but if not moot, the reformation claim presents triable issues of fact that

18  preclude summary judgment. US Fire's counterclaims for negligent misrepresentation and

19  concealment also present triable issues of fact.

20  ## III. FACTS

21  **A.    Yard 105**

22  Copart is in the business of processing and auctioning salvaged cars. This case concerns

23  a facility in Florida called Yard 105. Yard 105 consists of two separate parcels of land,

24  separated by railroad tracks that demarcate the border between the City of Hialeah (to the west

25  or "left side" of the tracks) and an unincorporated area of the County of Miami-Dade (to the east

26  or "right side"). (Larson Decl., Ex. III-B; Ruby Decl., Ex. 39 at 44:6-16[2]; Ex. 38 at 10:2-20.)

27  ─────────────────

[2] Hereinafter, all citations to numbered exhibits (1-42) are to exhibits to the Ruby declarations.

28

1    Copart acquired the Miami-Dade parcel, a former truck depot, in June 2002. (Ex. 1- 3.)

2    Copart acquired the Hialeah parcel, formerly raw land owned by the railroad, in November

3    2003. (Ex. 1, 4.)  Beginning in late 2004 or early 2005, Copart developed the Hialeah parcel

4    into a large parking lot, with a small shed.  Copart also extensively remodeled the former truck

5    depo building.  The renovations—including installation of furniture and computers—were

6    completed in July 2005. (Ex. 38 at 11:18-12:20, 15:7-21.)

7    Copart then turned on the computers, which allowed Copart and its customers to begin

8    directing vehicles to Yard 105. (Id. at 12:24-13:23, 19:2-20:3, 20:9-15; Ex. 5.)  On Yard 105's

9    opening day in July 2005, Copart had on site a staff consisting of at least a general manager and

10   four subordinates. (Ex. 38 at 20:17-23, 21:18-21.)  By the end of July 2005, Copart had 865

11   cars (worth approximately $1.3 million) on site. (Ex. 6.)  On August 29, 2005—after several

12   weeks of acquiring cars and processing necessary paperwork—Copart began auctioning the

13   cars. (Ex. 38 at 30:6-11.)  Between opening day and the first auctions, the number of employees

14   on staff at Yard 105 increased. (Ex. 38 at 22:25-23:3.)

15   On October 24, 2005, Hurricane Wilma struck southern Florida.  Three of Copart's

16   facilities—Yard 33, Yard 70, and Yard 105—were impacted.  At Yard 105, the large renovated

17   building was so damaged that it was eventually demolished by order of local authorities.

18   Allegedly, the small shed on the Hialeah parcel also suffered some minor damage.  Copart

19   submitted a claim for the hurricane damage to the three facilities to US Fire.

20   **B.    The US Fire Policy**

21   Copart first placed its property insurance with US Fire in 2003 (for the period of October

22   1, 2003 to October 1, 2004). (Ex. 8)  Copart renewed the insurance for the period of October 1,

23   2004 to October 1, 2005. (Ex. 9)  Just weeks before the hurricane, Copart renewed the

24   insurance again, for the period of October 1, 2005 to October 1, 2006. (Larson Decl., Ex. I-A.)

25   The 2005-2006 policy's "Building and Personal Property Coverage Form" provides:

26       We will pay for direct physical loss of or damage to Covered
         Property at the premises described in the Declarations caused by
27       or resulting from any Covered Cause of Loss.

28   (Id., Ex. I-B.)  Just below this coverage grant, the form defines "Covered Property" as follows:

1       Covered Property, as used in this Coverage Part, means the type
of property described in this Section . . . if a Limit of Insurance is
2       shown in the Declarations for that type of property.

3       a.     **Building**, meaning the building or structure described in the
4       Declarations....

5  The policy's declarations pages consist of "Common Policy Declarations" and "Supplemental

6  Declarations" for the commercial property coverage part.  (Id., Ex. I-A at POL 218; Ex. I-C.)

7       The Supplemental Declarations have a space ("Item 2") where, for a simple account, the

8  underwriter may describe the covered premises and the covered building(s) at those premises.

9  However, for an account involving many locations, there is not enough space.  Thus, for

10  Copart's policy, "Item 2" was filled out to state, "See Schedule of Locations."  This reference

11  was to a form in the policy bearing that title.  (See Larson Decl., Ex. I-D.)

12       The Schedule of Locations form provides space where multiple premises may be

13  described (by address, city, state, and zip code) and where any buildings *at* those premises may

14  be described (by building number and occupancy).  However, even that form is impractical for

15  very large accounts (such as Copart's) that involve over a hundred locations.  (Streacker Decl., ¶

16  3.)  For such accounts, it is common practice simply to incorporate by reference whatever

17  schedule was submitted to the underwriter, which is both more expedient and safer, as it avoids

18  any risk of error or omission in retyping the insured's information.  (Id.)  Here, in keeping with

19  that common practice, the Schedule of Locations states, "As per schedule on file with

20  company." (Id.; Larson Decl., Ex. I-D.)

21  **C.**     **The "Schedule On File" With US Fire**

22       Copart's insurance broker (Marsh Risk & Insurance Services) began the process of

23  procuring the 2005-2006 policy several months before the expiration of the 2004-2005 policy.

24  Marsh assigned John Wood, a property insurance specialist, to handle renewal negotiations with

25  US Fire and to solicit proposals from other property insurers.  (Ex. 10.)  On August 24, 2005,

26  Wood emailed US Fire underwriter Monica Streacker and asked her to "quote your expiring

27  participation."  (Ex. 11.)

28

1    To his email, Wood attached a spreadsheet labeled "Property Statement of Values 8-8-

2    05." (Id.) Among the facilities listed in the spreadsheet was Yard 105. (Id.) The yard was

3    shown as having "average inventory" of 865 cars, "average gross proceeds" per car as

4    $1,500.00, and "inventory exposure" as $1,297,500.00 (the product of the previous two

5    numbers). (Id.) However, no values were reported in the columns for buildings and

6    improvements, contents, computer equipment, or business interruption/extra expense. (Id.) The

7    "location total values" were reported as $1,297,500.00—i.e., as nothing more than the inventory

8    values. (Id.) No information whatsoever was reported in the columns for number of buildings,

9    construction type, square footage, and sprinklers and alarms. (Id.)

10    Streacker did not know that in fact, there were two buildings at Yard 105—the truck

11    depo building that Copart had acquired in 2002, and the building that Copart had more recently

12    constructed on the Hialeah side of the yard. When Streacker reviewed the "Property Statement

13    of Values 8-8-05" and saw that the columns for number of buildings, construction type, building

14    value, etc. were blank for Yard 105 (and several other yards), she did not suspect that the

15    document was incomplete. (Id., ¶ 8.) She assumed that Yard 105 literally was just a yard, with

16    nothing there at risk except inventory (i.e., cars)—or, that if there were something else there,

17    that Copart had decided to insure it with another company, or not at all. (Id., ¶ 9.)[4] Having no

18    reason to believe that the "Property Statement of Values 8-8-05" spreadsheet was incomplete,

19    Streacker saw no need to ask for more information. (Id., ¶ 10.)

20    After some negotiation, Wood and Streacker came to terms, and Streacker issued a

21    binder confirming the renewal. (Larson Decl. III-D.)[5] At no time between Wood's submission

22

23    _____

[4] As Streaker explains, it was not unusual for her to receive a statement of values including
24    locations for which no values were reported, because brokers routinely use the same statement
     of values for *liability* as well as property insurance placements, and even parking lots or
25    undeveloped land present liability exposures. (Streacker Decl., ¶ 7.)

26    [5] Copart notes that the loss in this case occurred before the policy was issued. However, Copart
     does not appear to argue—nor would Copart be *correct* to argue—that the terms of the policy do
27    not control. See Cal. Ins. Code § 382.5(b) ("a binder shall be deemed to include all of the usual
     terms of the policy"); Hibdon v. Truck Ins. Exchange, 657 P.2d 1358 (Utah 1983) (insurance
28    binder which was issued to renew an expiring policy incorporated expiring policy's terms).

1   of that spreadsheet and the issuance of the binder had Marsh submitted any other spreadsheet to

2   US Fire. (Streacker Decl., ¶ 11.)  Indeed, the binder referenced "TIV" (total insurable values)

3   of $424,472,311—the total of the values shown in the "Property Statement of Values 8-8-05"

4   spreadsheet. (Larson Decl. III-D; Ex. 11.)  After US Fire issued the binder and before the

5   hurricane, Marsh did not submit any other spreadsheet to US Fire. (Streacker Decl., ¶ 12.)

6   Thus, both on the date the policy took effect and on the date of the loss in question, the

7   "schedule on file with the company" was the "Property Statement of Values 8-8-05"

8   spreadsheet. (Id., ¶ 13.)[6]

9   **D.     The Claim**

10          On October 28, 2005, Marsh erroneously submitted notice of a claim with respect to

11  Yards 33, 70, and 105 to US Fire's underwriter.  On November 3, 2005, Marsh resubmitted the

12  notice to Carlton Clarke, a senior claims examiner in US Fire's claims department at its

13  headquarters in Morristown, New Jersey.  At the time, the policy had not yet been issued, and

14  Clarke did not have a copy of it or the "Property Statement of Values 8-8-05" spreadsheet.  So,

15  he reviewed information about Copart's account on US Fire's computer system.

16          It showed that total values of approximately $1.3 million had been reported for Yard

17  105.  The system did not show what the values were for.  However, Clarke assumed that they

18  included building values, so he did not expect that there would be a coverage issue.

19          Clarke retained an independent adjuster, Orvin Wills, to inspect the loss locations and

20  gather documents from Copart supporting whatever losses Copart might claim.  In the ten

21  months following the hurricane, and despite numerous written and telephonic inquiries, Copart

22  submitted no documentation to Wills.  Finally, in late August 2006, Wills received some

23  invoices.  Over the next three months, while continuing to receive documentation , Wills

24

25  [6] On November 1, 2005—*after the loss*—Copart sent Marsh an updated spreadsheet, which for
    the first time listed building and other values for Yard 105.  Suspiciously, Copart backdated that
26  spreadsheet to September 14, 2005—*before* the loss.  To its credit, Marsh did not forward that
    backdated spreadsheet to US Fire.  Yet for some reason, Copart submits that spreadsheet with its
27  motion—and in so doing, conveniently omits the *cover email* showing that the spreadsheet was
28  transmitted after the loss.  The Court should disregard the misleadingly dated and irrelevant
    document. (See US Fire's Objections To Copart's Evidence.)

1   prepared an accounting of the claim and discussed it with Copart.  In December 2006, Wills

2   submitted a report to Clarke.

3          When finally presented with a quantified and documented claim, Clarke proceeded to

4   review what items claimed were covered or not covered.  Clarke still did not have a copy of the

5   "schedule on file with the company" at the time of the hurricane, but he contacted the

6   underwriter, who reviewed the "Property Statement of Values 8-8-05" spreadsheet in her

7   underwriting file.  (Streacker Decl., ¶¶ 17-18.)  She saw and recalled that it did not show any

8   building values or otherwise describe any buildings at Yard 105, nor did it show any values for

9   business interruption or extra expense exposures.  (Id., ¶19.)  Streacker advised Clarke that Yard

10  105 was not covered for building or time element losses at the time of the loss.  (Id., ¶ 20.)

11         On December 28, 2006, Clarke wrote to Copart to state US Fire's position on the claim.

12  (Larson Decl., Ex. III-A.)  Clarke advised that US Fire would be paying for the damage to Yard

13  33 and Yard 70, subject to the deductible and adjustments for certain items not covered.  (Id.)

14  Clarke advised that US Fire would not be paying for the damage to the buildings at Yard 105,

15  because in US Fire's view, there was "no coverage for buildings or time element exposures at

16  [that] location."  (Id.)  Copart has accepted the $140,935.05 paid towards the damage at Yard 33

17  and Yard 70, but Copart brings this action to challenge US Fire's position that there is no

18  coverage for the losses at Yard 105.

19                                  **IV. <u>ARGUMENT</u>**

20  **A.     <u>Copart's Claim For Breach Of Contract Fails As A Matter Of Law</u>**

21         Copart is not entitled to any benefits for the building damage at Yard 105, for two

22  reasons.  First, none of the buildings there were "Covered Property."  Second, Copart concealed

23  the existence and value of those buildings when it solicited the US Fire policies.

24         **1.     The Buildings At Yard 105 Are Not Covered Property**

25         In an insurance coverage dispute, the insured bears the burden of proving a loss within

26  the basic scope of coverage afforded by the policy.  <u>Sony Computer Entertainment America Inc.</u>

27  <u>v. American Home Assur. Co.</u>, --- F.3d ---, 2008 WL 2736012 at * 4 (9th Cir. 2008) ("We begin

28  our analysis by examining the policy's affirmative coverage clauses, because if a claim does not

1  fall within those clauses, no coverage exists"). If—and only if—the insured meets this burden

2  does the burden shift to the insurer to prove that an exclusion or limitation applies:

3          If coverage exists, then the court considers whether any
           exclusions apply. If coverage does not exist, the inquiry ends.
4          The exclusions are no longer part of the analysis....

5  Id. at * 9. In its motion, Copart argues extensively that nothing in the policy "excludes" or

6  "limits" US Fire's liability for the damage to the buildings at Yard 105. In so doing, Copart

7  skips the critical first step in any coverage analysis—does the loss even fall within the policy's

8  basic scope of coverage? See id. ("proper coverage analysis begins by considering whether the

9  policy's insuring agreements create coverage for the disputed claim").

10         a.    The Policy Unambiguously Requires That Property Be "Described" In
                 The "Schedule On File" In Order To Be Covered
11

12         The basic scope of the policy's property coverage is set forth in the insuring clause in the

13  "Building and Personal Property Coverage Form," which provides:

14         We will pay for direct physical loss of or damage to Covered
           Property at the premises described in the Declarations caused by
15         or resulting from any Covered Cause of Loss.

16  (Larson Decl., Ex. B.) To bring the damage to the buildings at Yard 105 within this coverage

17  grant, Copart must prove that the buildings are "Covered Property at the premises described in

18  the Declarations." Copart cannot meet this burden.

19         Copart argues that Yard 105 qualifies as a "premises described in the Declarations"

20  because the yard number and address are listed in the "Property Statement of Values 8-8-05"

21  spreadsheet incorporated into the declarations. However, that is not the issue. US Fire

22  concedes that Yard 105 is a described premises (i.e., a covered location); the issue is whether

23  the *buildings* at Yard 105 are "Covered Property."

24         The policy defines Covered Property as follows:

25         Covered Property, as used in this Coverage Part, means the type
           of property described in this Section . . . if a Limit of Insurance is
26         shown in the Declarations for that type of property.

27         a.    **Building**, meaning the building or structure described in
                 the Declarations....
28

1  Under "Item 4" ("Coverages Provided"), the Supplemental Policy Declarations show a limit of

2  insurance ($2.5 million) for "BUILDING" property; so buildings are a "type of property" that

3  the policy covers. However, for any *particular* building to qualify as Covered Property, it must

4  be "described in the Declarations."

5  　　　The "Property Statement of Values 8-8-05" incorporated into the declarations does not

6  "describe" any buildings at Yard 105. Granted, the spreadsheet lists a facility named "Yard

7  105" and gives an address for the yard. However, for that yard, the space in the column for

8  "number of buildings" is blank. Also blank are the spaces in the columns for square footage,

9  construction type, alarms, and sprinklers. And perhaps most importantly of all—because it

10  would have directly affected the *premium* for the policy—no value for "building and

11  improvements" was reported. Thus, while the "Property Statement of Values 8-8-05" describes

12  Yard 105 as one of Copart's *premises*, the only *property* it describes *at* those premises is

13  inventory. Thus, only the inventory is "Covered Property."[7]

14  　　　Copart implicitly concedes that the document does not "describe" any buildings at Yard

15  105. Indeed, Copart's own Rule 30(b)(6) witness, Simon Rote, has dispelled any argument that

16  one must necessarily imply the existence of buildings at the facility from the information in the

17  spreadsheet. Rote testified that some of the facilities to which Copart assigns a "yard number"

18  are just that—yards—with no buildings on them. (Ex. 40 at 23:16-24:7.) Rote further testified

19  that such facilities may have street addresses associated with them even though they are just

20  parking lots. (Ex. 40 at 25:1-5, 25:16-19.) It is not surprising, then, that the "Property

21  Statement of Values 8-8-05" spreadsheet that Copart and its broker prepared and submitted to

22  US Fire contains many other columns besides "yard number" and "address" where *buildings*, if

23  any, are to be described.

24  　　　Conceding that the spreadsheet does not describe any buildings at Yard 105, Copart is

25  reduced to arguing that it was *unnecessary* for Copart to describe its buildings in the

26  spreadsheet. "Under the clear terms of the Policy," Copart asserts, "covered buildings are those

27

28  [7] Copart made no claim to US Fire for damage to any inventory at Yard 105, and it does not
seek to recover for any such damage in this litigation.

10665881.3                          -9-

1  buildings described in the Supplemental Declarations, not the SOV." However, as discussed

2  above, the Supplemental Declarations refer to the Schedule of Locations form, which

3  incorporates by reference the "Property Statement of Values 8-8-05" spreadsheet. Thus, the

4  spreadsheet is an extension of the declarations. In that spreadsheet, under the headings for

5  number of buildings, construction type, value, etc., Copart should have described any buildings

6  for which it sought coverage.

7        Copart's reliance on <u>Filippo Industries, Inc. v. Sun Ins. Co. of New York</u>, 35 Cal. App.

8  4th 1728 (1995), is misplaced. <u>Filippo</u> involved a claim for damage to inventory, not a claim

9  for damage to buildings. In dispute was the amount the insurer owed for the damage, not

10  whether the inventory was covered property. The policy language examined by the court was a

11  condition requiring monthly inventory reports, not an insuring clause granting coverage for

12  "damage to Covered Property," nor a definition of "Covered Property." Because Copart is not

13  making a claim for damage to inventory, and because US Fire is not asserting any breach of an

14  inventory reporting condition, <u>Filippo</u> is inapposite.

15              b.    <u>Extrinsic Evidence Confirms US Fire's Interpretation</u>

16        If (notwithstanding the arguments above) the Court finds the policy ambiguous, then the

17  door will open for extrinsic evidence of the parties' intent. Under California law, the best

18  evidence of intent is how the parties actually carry out the contract—i.e., "course of

19  performance" evidence. <u>Crestview Cemetery Ass'n v. Dieden</u>, 54 Cal. 2d 744, 753-54 (1960)

20  ("That the actions of the parties should be used as reliable means of interpreting an ambiguous

21  contract is, of course, well settled in our law"). Also relevant are *prior* dealings between the

22  parties. <u>Binder v. Aetna Life Ins. Co.</u>, 75 Cal. App. 4th 832, 853 (1999) (a "course of dealing

23  may … supplement or explain [a later] agreement"). Here, several transactions under the 2005-

24  2006 policy and prior policies demonstrate a mutual understanding that the policies' coverage

25  would be linked to the property described and values reported to US Fire.

26              (1)    <u>The 2003-2004 Policy</u>

27        One such transaction concerned the 2003-2004 policy, which Marsh discovered to

28  contain an error with respect to the total insured values ("TIV") listed on the policy:

> The TIV on Schedule of Locations . . . reads as $319,513,647. It should be $323,809,829 per our final SOV submitted and your final revised binder....

Marsh asked US Fire to amend (and US Fire did amend) the policy to state the correct TIV. (Ex. 8.) The fact that the TIV were stated in the policy, and the fact that the parties went to the trouble of amending the policy to state the correct TIV, demonstrate that the parties did not deem the TIV to be irrelevant to the contract.

Another significant communication—about a month before the 2003-2004 policy was set to expire—was an August 31, 2004 email, in which Marsh reported to US Fire that Copart was in the process of constructing a new building at Yard 36. (Ex. 13.) Marsh asked US Fire to confirm that even though the new construction would increase the building values at Yard 36 over what Copart had reported on the statement of values for the policy, the new building nonetheless would be covered for the policy's remaining term—based on the policy's coverage extension for "newly constructed property." (Id.) Given that Yard 36 had been listed on the statement of values, it would have been unnecessary to inquire about the application of the "newly constructed property" extension if—as Copart argues now—once a location is reported, all *buildings* at that location are automatically covered, regardless of whether a value or any other description of them was ever reported.

### (2)    The 2004-2005 Policy

In July 2005, Copart became concerned that it did not have coverage for an expensive computer system at a facility in Las Vegas. (Ex. 14-15.) In response, Marsh confirmed to Copart that the location was "already listed on your property policy" but only with a building value. (Ex. 14.) Marsh asked how much computer values Copart wanted to add to the policy. (Id.) After being informed that Copart wanted to add $5 million of computer values, Marsh emailed US Fire and requested an endorsement. (Ex. 16.) US Fire issued the requested endorsement, for an additional premium. (Ex. 9 at POL 213.) The endorsement—and the fact that Copart acquiesced to paying an additional premium for it—demonstrate that Marsh and Copart knew that merely listing a *location* in a statement of values was not sufficient to obtain coverage for all *property* at that location.

1        Further demonstrating the point is a second endorsement to the 2004-2005 policy that

2    Marsh requested after it received information from Copart regarding new values at various

3    locations. (Ex. 6.) Marsh prepared a spreadsheet of the new values, forwarded it to US Fire,

4    and asked, "Please endorse effective 7-31-05." (Ex. 17.) Principally, the new values were

5    inventory values, but they also included values for certain *buildings*, contents, computers, and

6    business interruption values at two facilities in Nevada. (Id. at 216.) In response, US Fire

7    issued an endorsement to the existing policy, adding coverage for the new property and

8    inventory values, for an additional premium. (Ex. 9 at POL 215.)

9        Also illuminative is a July 2005 exchange of emails between Copart and Marsh

10   concerning Copart's purchase of a property it formerly had been leasing. (Ex. 18.) The location

11   was "already included on [the] statement of values," so there was no need for Copart to report it

12   as a new location. (Id.) However, Marsh asked Copart if the *values* that Copart had reported

13   were "still adequate or if we should advise property underwriters" that the values had increased

14   as a result of the purchase. (Id.) Marsh's question regarding values makes no sense if values

15   are irrelevant.

16                    (3)    The 2005-2006 Policy

17       While the prior dealings between the parties are certainly probative of their intent,

18   perhaps most probative of their intent is how they maintained *the policy in question* (the 2005-

19   2006 policy) after it was issued and before the dispute over Yard 105 arose. See Crestview

20   Cemetary, supra. In January 2006, Marsh advised US Fire that Copart wished to delete

21   coverage for the inventory it had reported at the inception of the policy and requested that US

22   Fire amend the policy and refund part of the premium. (Ex. 19.) US Fire granted the request

23   and issued an endorsement, eliminating inventory coverage for a return premium of $94,543.32.

24   (Larson Decl., Ex. III-A at POL 297.) The endorsement specified that the "revised TIV" (total

25   insurable values) were now "$120,030,179." (Id.)

26       Subsequently, Marsh submitted an "updated statement of values" that reflected the

27   deletion of inventory values but also included building values for new locations and increased

28   building values for locations previously reported. (Ex. 20.) Marsh asked that the policy be

1   amended—effective January 1, 2006 —to cover the values that were new and the values that

2   had increased.  (Id.)  Marsh noted that the "new TIV" would be $153,679.079.  (Id.)  US Fire

3   granted the request and issued an endorsement, stating:

> In consideration of an additional premium [$18,121.22], it is
> hereby agreed and understood that the property values is amended
> as per updated statement of values dated 01-01-2006 as per
> schedule on file with the company.  Revised TIV - $153,769,079.

7   (Larson Decl., Ex. I-A at POL 298.)  Neither this endorsement nor the previous endorsement

8   (not to mention, the premium adjustments which resulted from them) make any sense if, as

9   Copart now contends, the values and other descriptions of property in the statements of values

10  were irrelevant to the parties' contracts.[8]

11  ### 2.    Copart's Concealment Of The Buildings' Existence And Values Voids Any Coverage That Would Otherwise Be Available For Yard 105

12  Based on the language of the policy and the extrinsic evidence of the parties' intent, the

13  Court should find that the buildings at Yard 105 do not qualify as "Covered Property."  Because

14  Copart cannot meet its burden of proving a loss within the policy's basic scope of coverage, it

15  should be unnecessary for the Court to analyze whether US Fire has any affirmative defense to

16  coverage.  That said, US Fire will now demonstrate that *if* the Court were to interpret the

17  policies as covering the buildings at Yard 105, US Fire *would* have a complete affirmative

18  defense to liability for the damage to those buildings, based on Copart's concealment of the

19  existence and values of the buildings at Yard 105.

20      a.    Where An Insured Fails To Disclose Material Information Concerning A Risk When Obtaining A Policy, The Insurer Is Not Liable For A Claim With Respect To That Risk, Even If The Non-Disclosure Was Unintentional

---

[8] Values for buildings and other exposures at Yard 105 were among the values added to the policy by way of the endorsement.  Had Copart requested that the values be added retroactively to the inception of the policy—and had Copart paid a corresponding premium—this would be a different case.  However, Copart asked that the endorsement be effective January 1, 2006— three months after the policy incepted, and more than two months after the hurricane.  The additional premium was calculated accordingly.  Thus, the endorsement does not support Copart's position that the Yard 105 buildings were covered on the date of the loss.

1    California law requires an insured to "communicate … all facts within his knowledge

2  which are … material to the contract …." Cal. Ins. Code § 332. "Neglect to communicate that

3  which a party knows, and ought to communicate, is concealment." Cal. Ins. Code § 330.

4  "Concealment, whether intentional or unintentional, entitles the injured party to rescind

5  insurance." Cal. Ins. Code § 331. However, "rescission is not an exclusive remedy," and in the

6  alternative, "the insurer may set up the concealment in an action on the policy"—i.e., simply

7  assert the concealment as a "defense to any action brought to enforce the apparent liability." De

8  Campos v. State Compensation Insurance Fund, 122 Cal. App. 2d 519, 527 (1954); Williamson

9  & Vollmer Engineering, Inc. v. Sequoia Ins. Co., 64 Cal. App. 3d 261, 274-75 (1976);

10  Designcraft Jewel Industries, Inc. v. St. Paul Fire & Marine Ins. Co., 399 N.Y.S.2d 225 (1977).

11    Copart may argue that it did not intentionally conceal information about Yard 105.

12  Given that Copart repeatedly ignored instructions and requests from its own broker to provide

13  complete information regarding its locations and the exposures at those locations, US Fire finds

14  it hard to believe that Copart was merely negligent in not reporting information about Yard 105

15  (and other yards) that was going to bear upon the premiums for the policy. More likely, Copart

16  was hoping to save on premiums. However, Copart's state of mind is ultimately irrelevant.

17  "[W]hether intentional or unintentional," a failure to communicate material information is

18  concealment. Cal. Ins. Code § 331.

19    b.    For Years, Copart Concealed Information About Yard 105

20    As discussed in more detail above, Copart acquired the former truck depot building in

21  June 2002 and listed it on its books as a $400,000 asset. (Ex. 1-3.) Yet, the statement of values

22  submitted to US Fire in connection with Copart's solicitation of the 2003-2004 policy did not

23  even list Yard 105 as one of Copart's locations—much less, report the existence of a *building* at

24  that location, with a value of $400,000 or more.[9] (Ex. 21.) For the 2004 policy, Copart

25

26  [9] A book value is typically less than a replacement cost value, because book values are based on
what it cost to acquire the asset minus depreciation, not on what it would cost to replace the
27  asset with brand new material. Given that book value (according to Copart's records) of the
truck depot was $400,000.00, Copart should have disclosed a higher figure as a replacement
28  cost value.

1    disclosed its acquisition of the empty acreage on the Hialeah side of Yard 105, but Copart again

2    failed to disclose the existence and value of the truck depot. (Ex. 15.) When Marsh asked why

3    Copart was reporting no values for Yard 105 and several other locations, Copart told Marsh that

4    there was "nothing there yet." (Ex. 22-23.)

5        Towards the end of the 2004-2005 policy, when Yard 105 opened for business, Copart

6    finally reported some values for the yard—but only inventory values. (Ex. 6, 17.) Copart

7    continued not to disclose the existence and value of the *building* that had been there for years.

8    Nor did Copart disclose the fact that it had just renovated that building and had also constructed

9    a *second* building at the site. When Marsh sent Copart a copy of the endorsement whereby US

10   Fire amended the policy to reflect the new inventory values at Yard 105, Marsh stated, "Please

11   note that only values for inventory are included in this adjustment as no information for values

12   pertaining to buildings, contents, computers, etc. have been reported." (Ex. 24.)

13       Shortly thereafter, when the 2004-2005 policy came up for renewal, Copart again failed

14   to disclose the existence and values of buildings at Yard 105. The "Property Statement of

15   Values 8-8-05" spreadsheet submitted with Copart's renewal solicitation showed the recently-

16   reported inventory values for Yard 105. (Ex. 11.) However, the columns for number of

17   buildings, square footage, construction type, alarms, and sprinklers were still all blank. (Id.)

18   Furthermore, no *values* were reported for buildings, contents, computers, or business

19   interruption. (Id.) US Fire's underwriter did not learn that there were any buildings at Yard 105

20   until Copart after the policy renewed and after the loss occurred. (Streacker Decl., ¶ 14.)

21            c.    As A Matter Of Law, The Information That Copart Concealed Was
                    "Material" To The Insurance Contracts
22

23       "Materiality is to be determined not by the event, but solely by the probable and

24   reasonable influence of the facts upon the party to whom the communication is due, in forming

25   his estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins.

26   Code § 334. As interpreted by California courts, this test can be restated as "whether the

27   information would have caused the underwriter to reject the application, charge a higher

28   premium, or amend the policy terms, had the underwriter know the true facts." Mitchell v.

1  United National Ins. Co., 127 Cal. App. 4th 457, 469 (2005). In Mitchell, the court held that

2  information that would "impact decisions on whether to insure and the premium to charge" is

3  material _as a matter of law_. See id. (affirming summary judgment for insurer).

4        Copart concedes that the value of the property to be insured under the policy and the

5  location of the property were factors in the underwriters' calculation of the premiums for the

6  policies. (Copart's Motion at 7:15-16; 10:1-3, 10:7, 10:10-13.) Copart argues that there were

7  _other_ factors as well, but the point is irrelevant. Nothing in California Insurance Code § 334 nor

8  Mitchell provides that the test for materiality is whether the information was the _sole_ basis for

9  the underwriter's "decisions on whether to insure and the premium to charge." As the Mitchell

10 court explained, the test is whether the information would have had an "impact" on those

11 decisions. Copart concedes that the information concealed would have had an impact here, and

12 although Copart attempts to _play down_ that impact, Copart's argument is irrelevant.

13       Moreover, the impact of the information in question was greater than Copart claims.

14 Reported values (and the distribution of those values across particular states, particularly

15 hurricane-prone or earthquake-prone states) were the _primary_ driver of the premiums.

16 (Streacker Decl., ¶ 4; Ex. 42 at 121:17-22; Ex. 41, 94:21-95:1.) The premium for the first policy

17 (the 2003-2004 policy) was quoted based on the locations and values reported in the broker's

18 solicitation. When the broker submitted an updated statement of values, reflecting an

19 approximate increase of 13% the total values to be insured, US Fire increased its quote by a

20 proportionate amount. (Ex. 25.) The values and their locations continued to play a role in the

21 pricing of the renewal policies and endorsements to those policies. (Ex. 9 at POL 94, 213-216;

22 Larson Decl., Ex. I-A at POL 224, 297-98.). Indeed, every time US Fire issued a quote, binder,

23 or policy, it listed the total insured values ("TIV") as part of the "rate basis." (E.g., Ex. 8 at

24 POL 5; Ex. 9 at POL 94; Ex. 26-28; Larson Decl., Ex. I-A at POL 224 & Ex. III-D.)

25          d.    Copart's Excuses For Not Disclosing The Information Are Neither
                  Compelling Nor Even Relevant
26

27       It is an immutable fact that at no time prior to the hurricane did the premiums received

28 by US Fire reflect any building values at Yard 105. (Streacker Decl., ¶ 16; Ex. 24.) Yet Copart

1 | asserts that it did not think it was necessary to disclose information about Yard 105 when

2 | soliciting the policies because allegedly, the yard was not operational and Copart had a

3 | "practice" of not reporting values for property not in use. (Copart's Motion at 8 n. 4.)  The first

4 | flaw in that argument has already been exposed—the insured is not at liberty to invent its own

5 | tests for "materiality" and secretly apply such tests in deciding what to disclose to the

6 | underwriter about the risk to be insured.  The sole test of materiality is the reasonable and

7 | probable effect that disclosure would have had on the underwriter.  Cal. Ins. Code § 334;

8 | Mitchell, supra.  Regardless of what the insured's alleged "practice" may be, information that

9 | would "impact decisions on whether to insure and the premium to charge" is material *as a*

10 | *matter of law*.  Id.

11 |         Moreover, even if materiality were something to be judged from the *insured's* point of

12 | view, Copart's attempt to justify its concealment of information about Yard 105 would not be

13 | compelling.  Operational or not operational, there were buildings at Yard 105; they were

14 | damaged; and Copart wants US Fire to pay approximately $1.5 million for that damage.  Yet

15 | Copart was somehow justified in not reporting the existence and values of those buildings to the

16 | underwriter?  Yet Copart was somehow justified in not paying premiums for building coverage

17 | for Yard 105?  Copart's theory defies reason.

18 |         Worse, it also defies the *facts*.  This fact is established both by business records and the

19 | testimony of Richard Kruse, Copart's vice president of operations and Rule 30(b)(6) witness on

20 | operations.  (Ex, 38 at 5:9-17, 6:16-22, 8:15-22, 9:3-8, 10:6-14.)

21 |         • The renovation of the truck depo and the development of the Hialeah acreage

22 |             were complete by late July 2005 (Id. at 11:18-12:20, 15:18-21), before Copart

23 |             submitted its renewal specifications to US Fire;

24 |         • By the end of July, Copart had $1.3 million of inventory on site (Id. at 12:25—

25 |             13:3; Ex. 6) and the buildings were "fully operational" (Ex. 38 at 20:9-15; see

26 |             also Ex. 39 at 227:18-24);

27 |         • Indeed, it is precisely *because* the buildings were operational that Copart was

28 |             able to receive inventory at Yard 105 in July 2005 (Ex. 38 at 13:4-23);

1    • In August 2005, Copart was telling its customers about Yard 105 on Copart's
2       website—which Copart would not have done if the facility was not yet open for
3       business (Ex. 5; Ex. 38 at 19:2-20:3); and
4    • By August 29, 2005—more than a month before the 2005-2006 renewal policy
5       was bound—Copart was not only receiving and processing inventory at the site
6       but was even *auctioning* it. (Id. at 30:6-11.)
7  Contrary to what Copart would have the Court believe,[10] at the time Copart was soliciting the
8  inventory endorsement to the 2004-2005 policy and the renewal of that policy, Yard 105 was
9  "fully operational." (Ex. 38 at 20:9-15.)
10       Copart's other excuses for its concealment of information about Yard 105 are equally
11 uncompelling. Copart argues that if US Fire "felt the omission of a value for the buildings at
12 Yard 105 'imperiled its interests,' US Fire could have simply refused to bid" on the renewal.
13 However, Copart offers no evidence that US Fire knew that there had been an "omission."
14 Copart offers no evidence that the underwriter knew there were buildings at Yard 105 when she
15 received the "Property Statement of Values 8-8-05" spreadsheet and prior statements of values.
16 In fact, she did not. (Streacker Decl., ¶ 14.)
17       The underwriter was hardly on any sort of "inquiry notice" of the existence of buildings
18 at the facility merely because the spreadsheet listed the facility as "Yard 105" and gave an
19 address for it. One of Copart's own witnesses testified that not all of Copart's "yards"—indeed,
20 not even all of Copart's "yards" that have street addresses—have buildings on the premises.
21 (Ex. 40 at 23:25-24:7, 25:1-5, 25:16-19.) Furthermore, even Copart's own broker, Marsh, was
22 under the impression that there were no buildings at Yard 105. (Ex. 22-23; Ex. 41 at 39:19-25,
23 59:11-20.)
24
25
26 [10] Copart offers the testimony of Simon Rote, a financial officer who has never even been to
27 Yard 105. US Fire objects to Rote's testimony because it lacks foundation of personal
   knowledge, and because Copart is bound by the testimony of its Rule 30(b)(6) witness, Kruse.
28 (See US Fire's Objections To Copart's Evidence.) Moreover, even if admissible, Rote's
   testimony about Yard 105 is obviously incorrect.

1    Copart should have told US Fire that there were buildings at Yard 105. Copart should

2    have done so by providing not just a yard number and an address but also the "number of

3    buildings," "square footage," etc. as provided for in the spreadsheet. *If* Copart had done so, and

4    if the underwriter had still quoted premiums for the renewal and prior policies despite Copart's

5    failure to report building *values*, perhaps Copart would have a point. However, not knowing

6    that there were any buildings at Yard 105, the underwriter had no reason to interpret the blank

7    space in the building value column as an omission. (Streacker Decl., ¶¶ 7-9.) Having no reason

8    to believe that anything belonged in that space, she had no reason to ask Marsh or Copart to fill

9    it in. See Robinson v. Occidental Life Ins. Co., 131 Cal. App. 2d 581, 585 (1955) ("It was not

10    incumbent upon [the insurer] to investigate [the insured's] statements …. It was [the insured's]

11    duty to divulge fully all he knew").

12    Copart also complains that US Fire never told Copart how to complete the statements of

13    values. However, Copart does not explain why any instructions by US Fire were necessary. As

14    Copart concedes, the form of the document was developed by Copart's own broker, Marsh—

15    and not uniquely for purposes of soliciting coverage from US Fire. Rather, Marsh developed

16    the form for Copart's prior insurance, and even in the years that Copart placed its coverage with

17    US Fire, Marsh used the form to solicit quotes from other insurers. US Fire accommodated

18    Copart and Marsh by accepting their form rather than requiring them to complete some other

19    form as the "schedule on file with the company."

20    The columns in the form are self-explanatory, and Copart was able to complete the lines

21    for most of the yards—why not also Yard 105? Moreover, in preparation for the 2005-2006

22    renewal, Marsh sent Copart a letter instructing Copart to "provide a current, complete listing of

23    all locations" and, "for each location … the respective current replacement cost property values

24    for . . . buildings/structures" and other property. (Ex. 28.) Marsh sent similar letters in prior

25    years. (Ex. 29-30.) Marsh repeatedly reminded Copart to disclose all values that it wanted to

26    insure. (Ex. 31-33.) Thus, Copart's claims that it did not know the statements were important

27    (or how to fill them in) are baffling.

28

1   **B.     Copart's Claim For Bad Faith Fails As A Matter Of Law**

2           "In order to establish a breach of the implied covenant of good faith and fair dealing

3   under California law, a plaintiff must show: (1) benefits due under the policy were withheld;

4   and (2) the reason for withholding benefits was unreasonable or without proper cause."

5   Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001). Here, no benefits under the

6   policy are due. Thus, Copart cannot satisfy the first essential element of its bad faith claim.

7   Absent a valid claim for policy benefits, a bad faith claim fails as a matter of law. Waller v.

8   Truck Ins. Exch., 11 Cal. 4th 1, 35-36 (1994).

9           Moreover, a "withholding of benefits due under the policy" is actionable in tort only if it

10  was "unreasonable or without proper cause." Guebara, 237 F.3d at 992. That *second* essential

11  element of a bad faith claim—unreasonableness—is lacking here even if Copart can somehow

12  prove a breach of contract. Even if somehow incorrect, US Fire's interpretation of the policy is

13  at least reasonable. "Under California law, a bad faith claim can be dismissed on summary

14  judgment if the [insurer] can show that there was a genuine dispute as to coverage." Guebara,

15  237 F.3d at 992; Lunsford v. American Guarantee & Liability Ins. Co., 18 F.3d 653, 656 (9th

16  Cir. 1994) (dismissing bad faith claim as a matter of law); Franceschi v. American Motorists

17  Ins. Co., 852 F.2d 1217, 1220 (9th Cir. 1988) (same).

18  **C.     If Not Moot, US Fire's Counterclaim For Reformation Presents Triable Issues Of
        Fact**

19
            Reformation is an equitable right that is provided for by Cal. Civil Code § 3399:

20
                 When, through fraud or a mutual mistake of the parties, or a
21               mistake of one party, which the other at the time knew or
                 suspected, a written contract does not truly express the intention
22               of the parties, it may be revised on the application of a party
                 aggrieved, so as to express that intention....
23

24  Copart suggests unlike any other party to any other contract, an insurer is not entitled to seek

25  relief from fraud or mistake under § 3399. For that proposition, Copart cites American Building

26  Maintenance Co. v. Indemnity Ins. Co. of North America, 214 Cal. 608 (1932).

27          American Builders did not involve a claim for relief under § 3399, nor was there any

28  express claim under any common law doctrine of reformation. However, invoking principles

1  similar to the principles of reformation, the insurer argued *as an affirmative defense to the*

2  *plaintiff's complaint* that the policy "did not express the actual understanding and agreement of

3  the parties." In rejecting the insurer's affirmative defense based on the facts of the case, the

4  court did not broadly hold that insurers are barred from seeking relief from errors in their

5  policies based on fraud or mistake. On the contrary, the court affirmed that insurance contracts

6  "are governed by the same rules which are applicable to contracts generally." Id. at 615.

7      Of course, any party seeking relief under § 3399 must prove that the contract does not

8  "truly express the intention of the parties" due to fraud, mutual mistake, or in some cases, a

9  unilateral mistake. Here, US Fire does not argue that there was fraud, but there is evidence of a

10  mistake—which was either mutual, or at least, a unilateral mistake that Copart's negotiator

11  (Marsh) knew or suspected. Thus, there is a triable issue of fact.

12      **1.    Whether There Was A Mistake**

13      While US Fire contends that the policy does not cover buildings that are not described

14  the "schedule on file with the company" (here, the "Property Statement of Values 8-8-05"

15  spreadsheet), Copart disagrees and contends that it covers all buildings so long as they are at

16  described locations. If (notwithstanding US Fire's points and authorities above) the Court

17  decides that Copart's interpretation of the policy is correct, then the policy will not have

18  accurately reflected the intent of the parties at the time the contract was drawn up. It is on that

19  chance that US Fire has brought a counterclaim for reformation.

20      Not knowing if the Court will agree with Copart—much less, on what grounds—US Fire

21  does not know where, if at all, the policy goes wrong in expressing the parties' intent. The

22  analysis begins with the property coverage form, and if the Court finds that the analysis ends

23  there in favor of Copart's position, US Fire will seek reformation of that form. If the Court's

24  analysis continues to the Supplemental Declarations but ends there in favor of Copart's position,

25  US Fire will seek reformation of the Supplemental Declarations. Similarly, if the Court's

26  analysis continues to the Schedule of Locations and ends there in favor of Copart's position, US

27  Fire will seek reformation of the Schedule of Locations. Just as Copart's motion is silent on the

28  issue of Copart's remedy for its claims—i.e., just as Copart offers no evidence of its alleged

1    damages—US Fire will not urge a particular remedy to the mistake in the policy until the Court

2    determines where the mistake lies.

3         It is sufficient for present purposes that there was a mistake, *somewhere*, if the Court

4    finds that the policy as written covers all of Copart's property, regardless of whether the

5    property was described to US Fire and regardless of whether Copart paid a premium for it to be

6    covered. US Fire did not intend such coverage (Streacker Decl., ¶ 6, 15), a point Copart does

7    not dispute. As discussed in Section A(1)(b) of US Fire's argument above, there is abundant

8    evidence in the course of dealing under the 2005-2006 policy and prior policies that Copart (or

9    at least its negotiator, Marsh) also did not intend such coverage. And as discussed in Sections

10   A(2)(c) and A(2)(d) above, there is abundant evidence that Marsh knew that the statements of

11   values were material to the contracts and for that reason repeatedly asked Copart to provide

12   complete and accurate information.

13        **2.     Whether The Mistake Was Mutual**

14        Although US Fire assembled the policies, Marsh reviewed them and did not hesitate to

15   seek corrections where it felt corrections were due. After reviewing the 2003-2004 policy,

16   Marsh emailed a long list of requested corrections to US Fire. (Ex. 12.) That requested resulted

17   in an endorsement to the policy. (Ex. 8 at POL 87-88.) Marsh conducted similar reviews—and

18   requested corrections—with respect to the 2004-2005 and 2005-2006 renewals. (Ex. 34-35.)

19   Given that Marsh participated in the verification of the terms of the policies, if the policies do

20   not reflect the intent set forth above, a jury could find that the mistake was mutual.

21        **3.     Whether, If The Mistake Was Unilateral, Marsh Knew Or Suspected The
              Mistake**

22

23        Even if there is no triable issue of a mutual mistake, there is at least a triable issue of an

     actionable unilateral mistake. In a September 19, 2005 email to Copart, Marsh stated that the
24
     statement of values was "incomplete with regard to insurable values and COPE information.
25
     Values have not been reported for certain locations and/or interests such as buildings…" (Ex.
26
     33.) As the document reflects, this issue was raised both within Marsh and with Will Franklin
27
     and Simon Rote of Copart. (Id.) And after the loss occurred, Marsh's Patrice McIntyre advised
28
     colleague Sherry Myers that Copart would "[h]ave sensitive issue in that one of the damaged

locs (#105 on 36th Ave, Miami) was a reported location per SOV, but no values given for Real or PP." (Ex. 36.)  In light of this evidence, a Court should let a jury decide whether Marsh knew or suspected that US Fire had been misled about Yard 105 and that Copart had not paid for coverage for buildings at that location.

**D.    US Fire's Counterclaim For Negligent Misrepresentation Presents Triable Issues Of Fact**

In addition to asserting Copart's *concealment* of information about Yard 105 as a *defense* to *Copart's* claims, US Fire brings a counterclaim for affirmative monetary relief based on Copart's underreporting (i.e., misrepresentation) of values for other locations.  US Fire seeks to recover the additional premiums it would have collected had Copart disclosed the true, higher values.  In moving for summary judgment on the counterclaim, Copart does not deny that the values it reported to US Fire were inaccurate.  Instead, Copart argues that US Fire has no legal or equitable recourse for the misrepresentations.  Copart is wrong.

**1.    US Fire Was Entitled To Rely On Copart's Representations**

Copart's policy is a replacement cost policy.  Thus, the risk that Copart asked US Fire to assume was the risk that Copart's property would be damaged, that Copart would have to replace it, and that upon replacing it, US Fire would have to indemnify Copart for the *cost* of replacing it.  Each year, Marsh provided US Fire with spreadsheets purporting to state what it would cost to replace the property Copart was seeking to insure, so that US Fire could evaluate whether to assume the risk, and if so, for what premium.

Just as California law prohibits a prospective insured from concealing information from an insurer, the law prohibits a prospective insured from *misrepresenting* information.  The governing principles, including the test for materiality, are generally the same as the principles concerning concealment.  See Cal. Ins. Code §§ 351-361.  As the Court explained in Mitchell:

> An insurance company has the unquestioned right to select those whom it will insure and to rely upon him who would be insured for such information as it desires as a basis for its determination to the end that a wise discrimination may be exercised in selecting its risks.

Mitchell, 127 Cal. App.4th at 469.

1     Like the insurer in <u>Mitchell</u>, US Fire's underwriters relied on the information provided

2  to them.  The information provided regarding the existence and value of Copart's property was

3  material to the decisions to insure Copart and for what premiums.  Had Copart reported the true,

4  higher replacement cost values, the premiums for the policies would have been higher.

5     Copart argues that the values it provided were "opinions as to a future event" and are

6  therefore not actionable.  However, there was nothing "futuristic" about the values.  Marsh

7  asked Copart to provide "current" replacement cost values, not replacement cost values as of

8  some future date.  (E.g., Ex. 28.)  Furthermore, the cost of replacing a building is something that

9  can be calculated with a high degree of confidence, as Copart's national property manager

10 testified.  (Ex. 37; Ex. 39 at 157:23-24, 158:4-6, 170:5-10; 176:13-178:9, 192:3-7, 194:4-6.)

11 Unfortunately, instead of asking its national property manager (or a consultant) to calculate the

12 values that Copart reported to US Fire, Copart just made them up.

13    **2.     US Fire Was Damaged**

14    An insurer may sue to recover damages resulting from an insured's misrepresentations

15 or concealment.  <u>De Campos</u>, <u>supra</u>.  In <u>De Campos</u>, an employer applied for workmen's

16 compensation insurance, listing only four partners.  The employer failed to list a fifth partner

17 who was also an employee and failed to declare the earnings of this undisclosed

18 partner/employee for premium purposes.  The court held:

19          These facts and the findings based upon them, support the legal
           conclusion that <u>defendant has a cause of action against the
20         plaintiff to compensate "for all the detriment proximately caused"
           by plaintiff's wrongful misrepresentation and concealment</u> and
21         breach of affirmative and promissory warranties. [cit. omitted.] If
           we view this as an action sounding in tort, it is consistent with the
22         concept of affirmance by the defendant of the contract of
           insurance....If this should be regarded as an action sounding in
23         contract, it is still an action for damages.

24

25 <u>Id</u>. at 525-526 (emphasis added).  The court concluded that when the employer breached the

26 obligation to report all wages paid employees and to pay premiums thereon, the insurer was at a

27 minimum damaged in the amount of the unpaid premiums.

28

1   Copart argues that an "out-of-pocket loss rule" should apply to this case.  Under such a

2   rule, Copart contends, US Fire has not been damaged because the losses for which it seeks to

3   recover are not expenses that US Fire has incurred but are instead revenue of which US Fire was

4   cheated.  However, as Copart's own brief makes clear, the "out-of-pocket loss rule" applies only

5   "where fraud is alleged to have caused damage in connection with the purchase, sale or

6   exchange of property." (Copart's Motion at 24:18-19.)  Here, US Fire is not suing over its

7   purchase, sale, or exchange of any property.  Rather, US Fire is suing over the circumstances

8   that led it to issue contracts of indemnity—i.e., risk-transferring agreements.

9   ## V. CONCLUSION

10   US Fire was entitled to know what risks it was being asked to insure, and it was entitled

11   to charge an appropriate premium in exchange for insuring those risks.  The spreadsheets

12   submitted by Copart over the years did not disclose the existence of any buildings at Yard 105

13   (much less, *describe* those buildings).  And because Copart reported no building values for Yard

14   105, Copart paid no premiums for any building coverage at the yard.  In view of these facts and

15   the plain language of the policy, the buildings at Yard 105 are not Covered Property.  And even

16   if they somehow qualify as such, under California law US Fire has a complete defense to

17   liability based on Copart's failure to disclose material information about Yard 105.

18   The Court should dismiss Copart's claims for breach of contract and bad faith, dismiss

19   US Fire's counterclaim as moot, and deny Copart's motion for summary judgment on the

20   counterclaim for negligent misrepresentation.

22   DATED:  July 24, 2008                    BULLIVANT HOUSER BAILEY PC

24   By      */s/ Samuel H. Ruby*
        Jess B. Millikan
25       Samuel H. Ruby
         Judith A. Whitehouse

26       Attorneys for Defendant
27       United States Fire Insurance Company