# EXHIBIT 38

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COPART, INC.,

    Plaintiff,

vs.                        No. C 07 02684 CW

CRUM & FORSTER INDEMNITY COMPANY,
UNITED STATES FIRE INSURANCE COMPANY,
and DOES 1-10,

    Defendants.

**CERTIFIED COPY**

_____
AND RELATED COUNTERCLAIMS.
_____

DEPOSITION OF RICHARD KRUSE

San Francisco, California

Friday, June 27, 2008

Reported by:
KELLI COMBS
CSR No. 7705

Job No. 91148

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                    OAKLAND DIVISION

 3

 4   COPART, INC.,

 5        Plaintiff,

 6   vs.                          No. C 07 02684 CW

 7   CRUM & FORSTER INDEMNITY COMPANY,
     UNITED STATES FIRE INSURANCE COMPANY,
 8   and DOES 1-10,

 9        Defendants.

10

11   _____

     AND RELATED COUNTERCLAIMS.
12   _____

13

14

15

16

17       Deposition of RICHARD KRUSE, taken on behalf of

18   Defendant at 650 California Street, Suite 1800, San

19   Francisco, California, beginning at 1:02 p.m. and ending

20   at 1:53 p.m. on Friday, June 27, 2008, before Kelli

21   Combs, CSR 7705.

22

23

24

25
```

RICHARD KRUSE                                          06/27/08

```
 1   APPEARANCE OF COUNSEL:
 2
 3   FOR PLAINTIFF:
 4
 5         PILLSBURY & LEVINSON, LLP
           BY: VERDICA PURI, ESQ.
 6         600 Montgomery Street, 31st Floor
           San Francisco, California 94111
 7         (415) 433-8000
           vpuri@pillsburylevinson.com
 8
 9   FOR DEFENDANTS:
10
11
           BULLIVANT HOUSER & BAILEY, PC
12         BY:  SAMUEL H. RUBY, ESQ.
           601 California Street, Suite 1800
13         San Francisco, California 94108
           (415) 352-2700
14         samuel.ruby@bullivant.com
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1        San Francisco, California, Friday, June 27, 2008
 2                      1:02 p.m. - 1:53 p.m.
 3                           RICHARD KRUSE,
 4     after having been duly sworn, testified as follows:
 5
 6
 7                           EXAMINATION
 8  BY MR. RUBY:
 9        Q    Good afternoon, sir.
10             Could you state your name for the record,
11  please?
12        A    Richard Kruse.
13        Q    Mr. Kruse, are you currently employed with
14  Copart, Inc.?
15        A    Yes, I am.
16        Q    What is your position?
17        A    Vice-president of operations.
18        Q    How long have you held that position?
19        A    Approximately two years.
20        Q    Were you employed with Copart prior to
21  becoming vice-president of operations?
22        A    Yes, I was.
23        Q    Okay.
24             When did you start working for Copart?
25        A    October of '98.  It will be ten years this
```

5

```
 1  October.
 2       Q    When you started with Copart, what was your
 3  initial title or position?
 4       A    I was a general manager of the Atlanta,
 5  Georgia facility.
 6       Q    Did that facility have a yard number?
 7       A    15.
 8       Q    What was your next position after being the
 9  general manager of Yard 15?
10       A    I became regional manager of the southeast
11  region.
12       Q    When did you receive that promotion?
13       A    Not quite sure.  I couldn't tell you exactly.
14  Approximately two years after I started with the
15  company.
16       Q    And between being a regional manager of the
17  southeast region and being vice-president of operations,
18  have you held any other positions?
19       A    Yes, I have.  Assistant vice-president of
20  operations.
21       Q    When did you receive that position?
22       A    June 1st of 2004.
23       Q    When did you become vice-president of
24  operations?
25       A    Approximately two years ago.  I don't remember
```

1   general manager to regional manager to assistant V.P.?
2       A    Yes.
3       Q    And I take it assistant V.P. then reports to
4   the V.P.?
5       A    There is no assistant V.P. anymore. I was
6   promoted to V.P. and that position has not been filled.
7       Q    Now, to whom do you report?
8       A    Gentleman by the name of Russ Lowy, L-O-W-Y.
9       Q    What is his title?
10      A    His current title is senior vice-president,
11  COO of Copart, Inc.
12      Q    COO, is that --
13      A    Chief operating officer, yes.
14      Q    All right.
15           We had asked for Copart to produce a witness
16  to talk about two topics dealing with property known as
17  Yard 105, and the topics were Topics Number 5 and 10,
18  which concern Copart's use of Yard 105, both the Miami
19  and Hialeah property or sides of that property.
20           Are you familiar with Copart's use of Yard
21  105?
22      A    Yes, I am.
23      Q    Okay.
24           When you were -- let me back up.
25           Is Yard 105 within the southeast region?

8

```
 1      A    No.
 2      Q    Okay.
 3           What is the region that Yard 105 falls under?
 4      A    South Florida.
 5      Q    Did the South Florida regional manager report
 6  to you when you were assistant vice-president of
 7  operations?
 8      A    Yes, he did.
 9      Q    Okay.
10           Who was that regional manager?
11      A    Gentleman by the name of Dan Hamlin,
12  H-A-M-L-I-N.
13      Q    Who was the first general manager of Yard 105?
14      A    Gentleman by the name of Mike Fadehl.  I think
15  it's F-A-D-E-H-L.
16           MS. PURI:  Sam, I'm just going to get some
17  water.  I'll be right behind you.
18  BY MR. RUBY:
19      Q    All right.
20           How long was Mr. Fadehl the general manager of
21  Yard 105?
22      A    I don't remember what date he left us.
23      Q    Could you narrow it down to just a year maybe?
24      A    He was into 206.  I can't remember the exact
25  date.
```

```
 1    Q    All right.
 2         I want to show you not a great copy,
 3    unfortunately, of a color photograph that was previously
 4    marked as Exhibit 51, which has been identified as
 5    showing part of Yard 105.
 6         Have you ever been to Yard 105?
 7    A    Numerous times.
 8    Q    Okay.
 9         Do you recognize what you see in the photo?
10    A    Yes, I do.
11    Q    Okay.
12         Did you see Yard 105 before the hurricane
13    struck?
14    A    Yes, I did.
15    Q    Now, are you aware of any distinction between
16    a Miami Dade side of 105 and a Hialeah side?
17    A    Yeah.  I believe the offices are in one town
18    and the storage location is in another town
19    jurisdiction.  I get confused on which is which, but for
20    all intents and purposes it means nothing to us.
21    Q    Okay.
22         We've been referring in previous depositions
23    to the large truck depot building that was struck by the
24    hurricane and that parcel as being the Miami side.
25    A    Okay.
```

10

1    Q    Then if you look sort of across the tracks
2 literally toward the yard where the cars are, that would
3 be the Hialeah side.
4    A    Yeah, okay.
5    Q    But we also sometimes just call the Hialeah
6 side "the yard" and the other side "the depot," so
7 either terminology may creep into this.
8         I want to ask you generally now about how
9 operations began at Yard 105. I have had another
10 witness explain the history of the renovation of the
11 building and the construction of the Hialeah side, so I
12 won't ask you about construction details or time
13 lines --
14   A    Okay.
15   Q    -- but I'm interested in what you might call
16 occupancy and use.
17   A    Okay.
18   Q    So can you tell me what was the first sort of
19 step other than construction towards occupying and using
20 any part of Yard 105?
21   A    The first step would be the installation of
22 our computer systems and desks and cubicles for the
23 employees, equipment. We would bring in equipment for
24 operating on the storage side, loaders, vacuum cleaners,
25 pressure washers, things like that that we use in our

11

1   normal, everyday business.
2       Q   All right.
3           Do you know when in time the desks and other
4   furniture were moved into Yard 105?
5       A   Memory serves me correctly, it was early July
6   of 2005 the construction was complete, we were able to
7   bring in the equipment to make it operate.
8       Q   And what about the computers and
9   telecommunication systems?
10      A   Computers were probably sent in early July.
11  Telecommunications and wiring and stuff is typically
12  done the weekend we open business, so come in, wired, we
13  turn the systems on.  So that would have been late July.
14      Q   What about the equipment used to move or clean
15  or otherwise handle the cars?
16      A   July, it would come in.  Sometime during July,
17  they come in and say -- sometime during July, the
18  equipment comes in as the manufacturers get it done and
19  ship it to us.  So it would have been over the course of
20  July.
21          MS. PURI:  Just go a little bit slower.
22          THE WITNESS:  I'm sorry.
23  BY MR. RUBY:
24      Q   When was --
25          When did Copart begin moving inventory onto

12

1   Yard 105?

2       A   Roughly, the end of July.  I'm not sure of the
3   exact date, but in the late 20s; 28, 29.

4       Q   The initial -- call it stocking of the yard,
5   was this something that was done more in a trickle or
6   more in a large initial movement?

7       A   What -- typically, what we do is we turn a
8   switch on in our computer system that starts sending
9   cars to closest yard logic.

10          So we would pick an opening date and hit the
11  switch that weekend, and Monday morning we would start
12  to receive assignments and the computer system would
13  automatically assign vehicles to the closest yard
14  location and other -- based on other things, seller
15  preferences or something like that.

16      Q   Prior to Yard 105 being ready to receive
17  inventory, was there any inventory being staged off-site
18  in anticipation of the opening of Yard 105?

19      A   No, not that I'm aware.

20      Q   So when the inventory started to arrive at
21  Yard 105, this was after your computer system was
22  operating?

23      A   Yeah.

24      Q   All right.
25          Let's look at Exhibit 61.  Exhibit 61 was

13

1     A     Yeah.  Kantor is based out of Oakland.  They
2  usually get a third party to do the installs and ship
3  the equipment, and then once it's all set up and
4  completed to our satisfaction, we sign off and a PO is
5  issued.
6     Q     Okay.
7           So based on the records that we see here
8  showing Kantor's invoices dated July 31st, 2005, does
9  that confirm that Kantor had provided its services in
10 Yard 105 by that time?
11          MS. PURI:  Objection; calls for speculation.
12          If you know, you can answer.
13          THE WITNESS:  Like I said, I'm not sure
14 100 percent that Kantor's did it.  However, during --
15 normally, this would be the process.
16 BY MR. RUBY:
17    Q     Okay.
18          And whether it was Kantor's or another vendor,
19 you're confident that by the end of July, the furniture
20 was installed at Yard 105?
21    A     Absolutely.
22    Q     Okay.
23          Let me show you now Exhibit 66.  This is an
24 excerpt from Copart's fixed assets master list by
25 location as of July 31st, 2005.  This particular page is

15

1        Q    Okay.

2             Let me show you now Exhibit 40.  Exhibit 40
3    was identified at a previous deposition as a printout
4    someone had made from Copart's website, and the printout
5    is dated August 5th, 2005.  If you go down to the third
6    page of the exhibit, you'll see there is a line for Yard
7    105.

8             Is this part of the website something that
9    Copart makes available for its clients or customers?

10            MS. PURI:  Objection; calls for speculation,
11   but you can answer.

12            THE WITNESS:  Yes.

13   BY MR. RUBY:

14       Q    Okay.

15            And what is at least one of the uses that a
16   client or prospective client can make of this part of
17   the website?

18            MS. PURI:  Same objection.

19            To the extent you know, go ahead.

20            THE WITNESS:  To see what locations we have,
21   where they are, physical addresses to pick up vehicles,
22   use it to look at our sale list to see exactly what's on
23   sale.

24   BY MR. RUBY:

25       Q    Okay.

19

1          Would Copart list on this part of its website
2    a facility that was not yet open for business?
3          A     No, they wouldn't.
4          Q     Once operations began at Yard 105 at the end
5    of July, was there any ramping up over the next couple
6    months or was this more or less you turn the lights on
7    and --
8          A     After July or before July?
9          Q     Well, after you started, was it sort of, you
10   know, fully operational at that time or was it only
11   partially operational?
12         A     It's fully operational.  We turn a switch on
13   and computer reverts cars to that location and we have
14   to be ready to take them.  We may not have been fully
15   staffed or -- but we're taking cars.
16         Q     All right.
17               When the computer was turned on that first
18   time, what staff did Copart have at Yard 105?
19         A     I do not know the exact count, but you
20   definitely had a general manager and we had some
21   transfers over from our other Facility 33.  So I know we
22   had some basic office staff in place and yard staff in
23   place to handle opening day.
24         Q     Okay.
25               Can you give me an idea what a basic office

20

```
 1    staff would consist of?
 2         A    CSRs, dispatchers, title clerks.
 3         Q    Would "CSR" be a customer service
 4    representative?
 5         A    Yes.
 6         Q    Now, I know you couldn't tell me exactly how
 7    many personnel you had at Yard 105 when it opened, but
 8    could you give me an approximation?
 9         A    No.  I don't remember.
10         Q    What would be a minimum number of just office
11    staff to be able to operate at all at that location?
12         A    At Miami, I'd have to figure out what the
13    average assignments were.  Our staffing model is based
14    on how many cars per day we get.
15         Q    Okay.
16              Well, could it be as few as one person working
17    under the GM?
18         A    No.  A minimum staffing for any location we
19    open, from the smallest size, is two yard people, two
20    office people, and a general manager.
21         Q    Okay.
22              Now, the yard people, what would their
23    functions be?
24         A    Their job is to receive the cars, inventory
25    the cars, prepare them for storage, move them to
```

1  storage, prepare them for sale, move them from storage
2  to sale, and load them out to customers.
3          THE WITNESS:  Am I going too fast?  I'm sorry.
4  BY MR. RUBY:
5      Q   When the hurricane struck Yard 105 in October
6  of 2005, did you become aware of that fairly quickly?
7      A   Yes.
8      Q   Okay.
9          To your knowledge, had staff evacuated Yard
10 105 --
11     A   Yes.
12     Q   Okay.
13         And how many hours or days in advance of the
14 hurricane, to your recollection?
15     A   Don't recall exactly, but if -- the city
16 officials issue evacuation order or we're not going to
17 put our employees in harm's way, so we abide by that.
18     Q   Now, a moment ago we were talking about the
19 staffing level when operations began.
20         Can you tell me, even approximately, what the
21 staffing level was at Yard 105 at the time of the
22 hurricane?
23     A   I don't have the average number of cars.  That
24 would be hard for me to guess at what it is.
25     Q   Do you recall if there was a buildup of staff

1  between opening day and the time of the hurricane?
2      A    Opening day and time of the hurricane.  Oh,
3  absolutely, yes.
4      Q    Was any inventory relocated away from Yard 105
5  in anticipation of the hurricane?
6      A    No.
7      Q    Between opening and the hurricane at Yard 105,
8  how was business there?
9           MS. PURI:  Objection; vague and ambiguous, but
10 you can answer.
11          THE WITNESS:  As compared to what?  I mean,
12 you know, again, we open a facility, goes to closest
13 yard logic.  Whatever assignments in that particular
14 operating area come into that location.
15          So we open them up and Monday morning they are
16 rolling in the door, so...
17 BY MR. RUBY:
18     Q    Okay.
19          What Copart does with these vehicles, I
20 understand, is they auction them, correct?
21     A    Yes.
22     Q    Okay.
23          So the end objective of the business is to
24 sell the vehicles, right?
25     A    Yes.

23

```
 1         MS. PURI:  Sure.
 2                (Recess taken at 1:42 p.m.
 3                 resumed at 1:52 p.m.)
 4    BY MR. RUBY:
 5      Q   Okay.
 6          Mr. Kruse, have you been able to ascertain
 7    when it was that Copart first began selling cars at Yard
 8    105?
 9      A   Yes.  The first sale date was 8/29 of 2005.
10      Q   So August 29, 2005?
11      A   Yes.
12      Q   Very good.
13          MR. RUBY:  Well, thank you for coming by.
14    Those were my questions.
15          You'll have an opportunity to review the
16    transcript and make any changes if you feel a word was
17    mistranscribed or something like that.
18          What we've been doing is we have -- instead of
19    asking the witness to come and review the transcript,
20    the witness will review -- counsel will make her copy
21    available to the witness within 30 days and then the
22    witness can return to counsel and the court reporter a
23    signature page and errata sheet and all the other
24    stipulations and so on and so forth.
25          MS. PURI:  That's fine.  Thank you.
```

                                                              30

```
 1         I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby certify:
 3         That the foregoing proceedings were taken
 4   before me at the time and place herein set forth; that
 5   any witnesses in the foregoing proceedings, prior to
 6   testifying, were duly sworn; that a record of the
 7   proceedings was made by me using machine shorthand
 8   which was thereafter transcribed under my direction;
 9   that the foregoing transcript is a true record of the
10   testimony given.
11         Further, that if the foregoing pertains to
12   the original transcript of a deposition in a Federal
13   Case, before completion of the proceedings, review of
14   the transcript [ ] was [ ] was not requested.
15         I further certify I am neither financially
16   interested in the action nor a relative or employee
17   of any attorney or party to this action.
18         IN WITNESS WHEREOF, I have this date
19   subscribed my name.
20
21   Dated:  JUL 0 1 2008
22
23
24            KELLI COMBS
             CSR No. 7705
25
```