# EXHIBIT 39

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

COPART INC.,

          Plaintiff,

vs.                                    No. C 07 02684 CW

CRUM & FORSTER INDEMNITY
COMPANY, UNITED STATES FIRE
INSURANCE COMPANY, and DOES
1-10,

          Defendants.                  CERTIFIED
                                       COPY

_____

AND RELATED COUNTERCLAIMS.

_____

DEPOSITION OF MICHAEL W. CARSON

San Francisco, California

Tuesday, May 20, 2008

Reported by:
DARCY J. BROKAW
RPR, CRR, CLR, CSR No. 12584

Job No. 86979

1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
2                   OAKLAND DIVISION

3

4   COPART INC.,

5          Plaintiff,

6   vs.                          No. C 07 02684 CW

7   CRUM & FORSTER INDEMNITY
    COMPANY, UNITED STATES FIRE
8   INSURANCE COMPANY, and DOES
    1-10,

9
           Defendants.
10

11   _____
    AND RELATED COUNTERCLAIMS.
12   _____

13

14

15          DEPOSITION OF MICHAEL W. CARSON,

16   taken on behalf of Defendant United States Fire Insurance

17   Company, at Bullivant Houser Bailey PC, 601 California

18   Street, Suite 1800, San Francisco, California, beginning at

19   9:04 a.m. and ending at 4:40 p.m., on Tuesday, May 20, 2008,

20   before me, DARCY J. BROKAW, RPR, CRR, CLR, CSR No. 12584.

21

22

23

24

25

1                           APPEARANCES

2

3    For the Plaintiff, Copart, Inc.:

4             PILLSBURY & LEVINSON, LLP
              BY: ERIK L. LARSON, ESQ.
5             600 Montgomery Street, 31st Floor
              San Francisco, California 94111
6             415-433-8000
              rlarson@pillsburylevinson.com

7

8    For the Defendant United States Fire Insurance Company:

9             BULLIVANT HOUSER BAILEY PC
              BY: SAMUEL H. RUBY, ESQ.
10            601 California Street, Suite 1800
              San Francisco, California 94108
11            415-352-2700
              samuel.ruby@bullivant.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    San Francisco, California, Tuesday, May 20, 2008

2              9:04 a.m. - 4:40 p.m.

3

4              MICHAEL W. CARSON,

5    having been first duly sworn, was examined and testified as

6    follows:

7                    EXAMINATION

8    BY MR. RUBY:

9    Q    Could you state your full name, please.

10   A    Michael W. Carson.

11   Q    Mr. Carson, my name, again, is Sam Ruby.

12   I'm the attorney for the defendant in this case, and

13   I've asked you to come here today to answer some

14   questions.

15        Have you sat for a deposition before?

16   A    Yes.

17   Q    More than once?

18   A    Three or four times.

19   Q    All right.  I'll assume, then, that you're

20   familiar with the process.  Let me just remind you

21   of a couple of key issues that can affect the

22   process.

23        One is that although we're in an informal

24   setting here today and informal settings tend to

25   induce conversation, it's important that we not talk

8

```
 1            We'll try to take some breaks at sort of
 2  key chronological times, but if at any point you
 3  need to take an unscheduled break, just let me know
 4  and we'll try to accommodate you.
 5            All right.  With that, first I need to get
 6  some basic background information from you.
 7            Are you currently employed with Copart?
 8       A    Yes.
 9       Q    What is your current position or title?
10       A    National property manager.
11       Q    How long have you been the national
12  property manager?
13       A    Late '99 or early 2000.
14       Q    What are your responsibilities as national
15  property manager?
16       A    I am responsible for all of Copart's 146
17  American yards facilities, including Canada and
18  Alaska, the two facilities we have in Canada and the
19  16 facilities we have in the United Kingdom, Great
20  Britain, England, Ireland and -- England, Scotland
21  and Wales.
22       Q    And when you say you're responsible for
23  the properties, what in particular are you
24  responsible for?
25       A    Well, basically I was responsible for
```

1    distinguishment between the properties like we're

2    making.  They pull all the permits.  So that's what

3    this is about.  I didn't want to be --

4        Q    All right.  Well, thanks.  I appreciate

5    that.

6            Although we've been talking about the City

7    of Hialeah side and the City of Miami side, both of

8    those cities are in Miami-Dade County, correct?

9        A    Yes.  This is actually Miami-Dade County.

10   It's not in Miami city.

11       Q    Okay.

12       A    And this is actually in the City of

13   Hialeah.

14       Q    And the truck depot, it's in the county;

15   is it part of the city?

16       A    No.

17            MR. RUBY:  All right.  This will be

18   Exhibit 56.

19                    (Defendant's Exhibit 56 marked

20                     for identification)

21   BY MR. RUBY:

22       Q    Exhibit 56 is also from the Copart

23   production.  And it'll not the same but a similar

24   form to what we just looked at.

25            Now, sir, can you tell me whether this

44

1    BY MR. RUBY:

2        Q    58 is another document from the Copart

3    production.  Sir, can you tell me what it is?

4        A    It appears to be my final Certificate of

5    Occupancy for the truck terminal property on the

6    Miami-Dade side.

7        Q    Okay.  And just for the record, can you

8    explain what a Certificate of Occupancy is or

9    signifies in this process?

10       A    This would be the final document that you

11   receive from a building department or licensing

12   authority that basically says that your construction

13   is finished and has been completed and all proper

14   inspections have been done and signed.  All of the

15   municipalities or the city's reviewing departments,

16   fire, water, et cetera, have inspected and signed

17   off, and this would be the final okay to actually

18   occupy the property.  No further construction.

19       Q    Now, right about the middle, you see

20   there's a line that says "date of CO," Certificate

21   of Occupancy, "Issuance."  Are you with me?

22       A    I gotcha.

23       Q    Okay.  And the best I can make out on this

24   copy is that it's an August '05, but Lord knows

25   what's between.  Do you have any idea?

```
1                    (Defendant's Exhibit 73 marked
2                   for identification)
3    BY MR. RUBY:
4        Q     All right.  Exhibit 73 is an e-mail chain
5    from the Copart production, and the one I want to
6    focus on, Mr. Carson, is the one in the middle, from
7    you to Mr. Franklin on September 14th of 2006.
8            Do you see that?
9        A     Yes.
10       Q     Okay.  Now, I don't know if this is the
11   second e-mail you had in mind, but this is a second
12   e-mail now concerning the damage to the building.
13   Is this the second e-mail you had in mind, or did
14   you have something else in mind?
15       A     No.  Actually, if there had been any kind
16   of short, shoot-from-the-hip estimate given before,
17   it would have been before August.
18       Q     Okay.
19       A     And I don't know if there was or not.  The
20   people in my company seem to think that I know
21   something about construction, and they think that I
22   can pull numbers out of my pocket and say:  This is
23   what it should be.  And I've been very fortunate
24   over the years to be very close with those numbers,
25   but I always qualify them as they come out of the
```

1    pocket, they're shooting from the hips.

2         And there could have been a

3    shoot-from-the-hip number earlier than the

4    August 28th number.  But the August 28th Exhibit 72

5    number was more than just an educated guess; it was

6    based on experience and research.

7         Q    In that time frame immediately after the

8    hurricane, when there was some hope that perhaps the

9    building could be repaired as opposed to demol'ed

10   and rebuilt, did you have even a shoot-from-the-hip

11   figure in that time as to how much the repair would

12   cost?

13        A    To be honest with you, I don't think I

14   did.  It's possible I shot a number out there; but

15   after examining the building myself, the cost of

16   repairing the building, seeing the structural damage

17   of the embeds, it was such that my gut was we were

18   better off tearing it down and putting a new one up.

19        That's not to say I couldn't have repaired

20   it.  If you give me the money and the time, mostly

21   the money, I can rebuild 9/11.  But my gut was that

22   the building was in pretty bad shape.  Because it

23   wasn't a new building; it was an old trucking

24   terminal.  So if I put a number out there, it's very

25   possible, but I don't recall.

MICHAEL W. CARSON                                    05/20/08

1    and from TBT, harder estimates for the construction

2    of this -- of the project based on the plans we have

3    now.

4          Q    Okay.

5          A    And I had done some work on the computer

6    using the Means, M-e-a-n-s, Construction Index,

7    which is a nationwide construction organization that

8    does average prices per square foot per

9    jurisdiction, by zip code or by county or whatever

10   that uses the guide when estimating.

11              I went back and ran some of those

12   programs, and then I sat down with those Means

13   analyses with the just-received TBT firmer estimate,

14   and with the Dov Liven architect estimate, the

15   one-pager he had sent me, or three-pager, whatever

16   it is, and I went back and tried to redo my numbers

17   that I had done on this e-mail dated August 28th,

18   2006, Exhibit 72.

19              So the hen scratching you see there is my

20   work product that was intended for myself.

21         Q    Okay.  Let's see.  In the pile I handed

22   you, can you pull out the latest TBT estimate?

23              Can you hand that to the court reporter,

24   and we'll mark that as 75.

25

170

1    gut?  Who do you trust?  Do you trust the low bidder

2    or not?  And then we determine how the job goes from

3    that.

4              During that negotiating process, the

5    subcontractors are selected.  We come up with the

6    final number, and it's a hard number; it's done.

7         Q    All right.  Then let's talk about

8    Exhibit 76 then.  Is this an estimate that you asked

9    Mr. Liven to provide to you?

10        A    Yes.

11        Q    Is this also based on his plans?

12        A    Yes.

13        Q    All right.  Then going to Exhibit 77,

14   which is the Square Foot Cost Estimate Report "A",

15   can you explain to me again what this is?

16        A    Means Construction, that sponsors programs

17   for builders, where you're basically estimating

18   programs, and they're for any member of Associated

19   Builders and Contractors, AGC; and they're used for

20   estimating, but they're also used as support data.

21             If you have a contractor here in

22   California and he decides he's got a good customer,

23   the customer wants him to build in Hialeah, Florida;

24   the guy going into the contract goes into Hialeah,

25   Florida, doesn't know that market.  So he wants to

1    get some reality, because he's in a negotiating

2    stage, too, with his owner that he's going to build

3    for.  They give him real numbers they can work with.

4          So what this is, Means is a tool that

5    says, well, if you're doing strip footing, concrete

6    reinforced, load level 11.1 kilos lineal foot, then

7    that price should be 2.11 per lineal foot or square

8    foot.  And you try to build off of the computer

9    programs as close to what you have in your hands

10   from the owner to go back to him and say, well,

11   yeah, this is pretty close, and we'll fine-tune it

12   and we'll get the hard bids and we'll work from

13   there.

14          So I get this getting as close as I could

15   to what I'm doing down there, and this is my reality

16   check on these guys.

17   Q    Okay.  Let me break that down.

18          Is this like a software program that you

19   access on your computer?

20   A    Yes.

21   Q    And does someone have to be a member of an

22   association in order to be able to acquire that

23   software?

24   A    Not necessarily.

25   Q    Okay.  How did you acquire that software?

1      A     On a computer, going on a website.  I used

2   to have a license.

3      Q     So what you did was you went to a website.

4   Was there some way through the website to access the

5   program?

6      A     Yes.  Means is the only one I know

7   nationally.

8      Q     And you were able to access the program?

9      A     Yes.

10     Q     All right.  And I take it the program asks

11  you for some variables before it can spit out the

12  numbers?

13     A     Yes.

14     Q     Okay.  Let's talk about those variables.

15  And if they're shown on here, maybe you can refer me

16  to those.

17           What would be one variable that you have

18  to plug into the program?

19     A     Example A was a shop, and basically it's a

20  shop that's covered with -- it's a metal building

21  structure, metal framing, metal studs, steel roof

22  deck, but the outside structure is not a metal

23  cladding.  It's like a dry-bit type situation.  And

24  you try and plug in as close as you can what you

25  have to fit into their categories to get what you

1    badly and they budget a million-two and it's

2    4 million bucks, I'm the guy that's going to get it.

3              So what I did, I went back to Exhibit 72,

4    and at that time I said two years ago -- two years

5    ago, I said 120 bucks a square foot.  I got 124.61

6    two years later.  I feel pretty good about that.  I

7    feel I'm in the ballpark, okay.  So that's basically

8    what the rest of that is doing.

9              Then in the 120 bucks from 2006 -- and I

10   clarified it right in the memo -- did not include

11   architectural; engineering fees; MEPs, which is

12   mechanical, electrical, plumbing; impact fees and

13   permit fees.

14             And if you add those numbers in off of Dov

15   Liven's new estimate, add them to my 120 bucks a

16   foot, times the square foot, I'm at 134.36.  And,

17   you know, all that really does -- then the last page

18   is I've got them all.  I made a synopsis of it.  I'm

19   within 20 cents of TBT.  And without the fees, I was

20   120.  Means is 132.  So I've got an idea what this

21   project is worth.

22        Q    Okay.  On the last page, page 6 of your

23   notes, you refer to an e-mail.  You mention "Mike

24   Finigan at Marsh," an e-mail from Mike Finigan at

25   Marsh to Will Franklin on August 21, 2006, "old

192

1    building valued" at 800- to 900,000.

2            Do you see that?

3        A    Yes.

4        Q    Is that an e-mail you looked at?

5        A    Yes.

6        Q    And in that e-mail, which I don't think

7    we've looked at today, was there some number that

8    you had put forth that Mr. Franklin was discussing

9    with Mr. Finnegan?

10       A    I don't know what Will Franklin and Mike

11   Finigan discussed, but what I know is going back to

12   my e-mail of August 28th, 2006, when they asked me

13   about rebuilding it and I was going like this, not

14   new building, but if I had been able to rebuild the

15   old building, if it wasn't condemned, what would it

16   have cost; and at that time, based upon the work

17   that I had just done with TBT and everything that I

18   had current, I assigned a value to it.  And I don't

19   remember what it was.  It was 826,500 to 850,000

20   bucks.

21           And someplace, someplace, I saw an e-mail

22   that said Mike Finigan at Marsh to Will Franklin,

23   8/21/06, that the old building was valued at 8- to

24   900, and I'm looking at my e-mail in August, saying,

25   well, I said 826,500 to 850,000.  So we all had to

193

1    be in the same ballpark.  I don't know where their

2    number came from, but I know where my number came

3    from.

4         So this is not germane to what we're doing

5    here, but this is what I do for a living.  My

6    numbers are good.

7         Q    Okay.  The building called for in the

8    current plans, is that building larger than the

9    building that existed before the hurricane?

10        A    Yes.

11             MR. LARSON:  Wait for his question to

12   finish.

13             THE WITNESS:  I'm sorry.

14             The new building is 12,800 feet, the

15   Colton building.  The truck warehouse was 8,700

16   feet.

17   BY MR. RUBY:

18        Q    And the office space within the new

19   building, which was, I think, 5,000 square feet that

20   we saw in the plans --

21        A    I'd have to look back, but -- I don't

22   remember exactly what the office space is.

23             No.  The office space is 7,800 feet.

24        Q    Okay.

25        A    So our office has grown over the old

1    site, there wouldn't have been any kind of power to

2    it yet.

3              MR. RUBY:  And then we'll mark as

4    Exhibit 86 the pile for the modular building, also

5    known as the double-wide trailer.

6                        (Defendant's Exhibit 86 marked

7                         for identification)

8              MR. RUBY:  With that, why don't we take a

9    break.

10                       (A brief recess was taken.)

11   BY MR. RUBY:

12       Q    Okay.  Mr. Carson, one of the topics for

13   which you were designated is No. 21, the extent to

14   which such extra expenses avoided or minimized the

15   suspension of business at the Miami property and

16   allowed Copart to continue operations there.  I

17   think we covered this, but just to be sure.

18             Are you very familiar with what the

19   operations were at Copart at Yard 105 before the

20   hurricane?

21       A    Yes.

22       Q    Okay.  What were the operations?

23       A    We had basically opened for business, we

24   were bringing cars in.  The cars were being hauled

25   in by sub-haulers, contract haulers.  Our people

1    that's two years, that's maybe three years.

2         Q    Okay.  I'll show you what was marked

3    previously as Exhibit 24.  And I want to direct your

4    attention to a Statement of Values that is attached

5    there.  And if you go to the page that has Yard 105

6    on it, which is page CPT25, you'll see that under

7    "Building," there's a number of 750,000.

8              Do you follow me?

9         A    Yes.

10        Q    Okay.

11        A    Yes, "Building and Improvements," 750,000.

12        Q    Right.

13        A    Yes, I see it.

14        Q    As of the date of the hurricane, so

15   including all the renovations that Copart had made

16   to the truck depot, was the cost to rebuild and

17   replace the entire structure more, less or

18   equivalent to $750,000?

19             MR. LARSON:  Vague and ambiguous, calls

20   for speculation, outside the scope of the 30(b)(6).

21             THE WITNESS:  Can you repeat that?

22   BY MR. RUBY:

23        Q    Sure.

24             We've been looking at some numbers today,

25   various numbers that have been larger than 750,000,

1    and I want to try to understand why.  We have a

2    number here of 750,000 that was reported by Copart.

3    And I'll spare you the details of how that happened,

4    but this is a number that was reported shortly after

5    the hurricane, and I'm trying to determine if the

6    number is accurate or not.

7            And since you've done quite a lot of

8    analysis and replacement cost estimation for the

9    yard for the truck depot, I'd like to know if you

10   have an opinion on whether 750,000 was a fair

11   approximation at the time of the hurricane of what

12   it would have cost to rebuild the entire structure.

13           MR. LARSON:  Same objections.

14           THE WITNESS:  I think it's low.  And I

15   think in my memo of August 2006, I put a valuation

16   in there with numbers in there that would have

17   correlated that we can take those numbers by square

18   footage and extrapolate the 787 square feet out, and

19   that would give you what I think is the true value

20   of rebuilding the property and would give you the

21   true value if the building could have been salvaged

22   of how much it would have cost to rebuild it.

23           I think the rebuild -- and again, I think

24   the number to rebuild it, if we had been able to,

25   was 95 bucks a foot times 8,700 square feet, which I

1    whatever that average was, 124 to 132 bucks a foot.

2              So is this number a real number for back

3    then?  I think it's no.

4         Q    If you could turn to Exhibit 28, please,

5    this is a Statement of Values dated January 19th,

6    2007.  It indicates it was updated by, among others,

7    Mike Carson?

8         A    Sure.

9         Q    Now, sir, first of all, have you seen this

10   document?

11        A    No.

12        Q    Do you recall sometime around January of

13   2000 being asked by anyone at Copart to provide some

14   analysis or opinions about replacement cost values

15   of any properties owned by Copart?

16        A    Yeah, I occasionally get calls, and the

17   calls usually are from somebody in accounting

18   saying, we bought this property in Walton, Kentucky,

19   and it's got four buildings on it, what are the

20   buildings worth?  Well, okay, that one is worth

21   50,000 as it sits, that one over there is worth

22   125,000 as it sits.

23             Is that the replacement cost?  No.

24             But what's the building worth right now?

25   That's what it's worth.

1         I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3         That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11        Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [X] was [  ] was not requested.

15        I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated: _____ MAY 2 8 2008 _____

22

23

24   DARCY J. BROKAW
     CSR No. 12584

25