# EXHIBIT C

Page 1

RONALD KELEMAN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION
-------------------------------------X
COPART,

        Plaintiff,

        -against-   Case No. C072684 CW

CRUM & FORSTER INDEMNITY
COMPANY, UNITED STATES FIRE
INSURANCE COMPANY, and DOES
1-10,

        Defendants.
-------------------------------------X
AND RELATED COUNTER CLAIMS
-------------------------------------X

DEPOSITION OF RONALD KELEMAN

New York, New York

Thursday, July 17, 2008

REPORTED BY:   BARBARA R. ZELTMAN
              Professional Stenographic Reporter

Job Number:  410523

1                RONALD KELEMAN
2       Q    And the credits that you are
3  referring to, was that something required by
4  the industry or by Crum & Forster?
5       A    Well, it's actually by the industry,
6  by State and then Crum & Forster.
7       Q    During your time with Crum &
8  Forster, one of the things that you were able
9  to do would be to cut and paste e-mails that
10 came in on the Lotus Notes program into the
11 electronic claims file; is that right?
12           MS. MILLIKAN:  Objection.  Lacks
13      foundation.
14           But you can answer the question.
15      A    If I recall, yes, you could.
16      Q    Is that one of the things that you
17 actually did during your time at Crum &
18 Forster?
19      A    Yes, I did.
20      Q    When you did that, would you make
21 sure to be as accurate and thorough as
22 possible when cutting and pasting?
23      A    Yes.
24      Q    And did you train the folks that
25 worked with you or tell the folks with you

1                        RONALD KELEMAN
2     that they should do the same?
3         A    Yes, I did.
4         Q    And the purpose of that would be to
5     be able to have an accurate and truthful
6     record in the electronic claims file?
7         A    Correct.
8         Q    We talked about your time at AIG
9     having general adjusters.
10             Did you also have general
11    adjusters at Crum & Forster?
12        A    We had one.
13        Q    And who was that during your time
14    that you were there?
15        A    Ed Frank.
16        Q    And do you recall the Hurricane
17    Wilma event during your time at Crum &
18    Forster?
19        A    Sure do.  Definitely.
20        Q    Do you recall an insurer named
21    Copart making claims under its property
22    policy for Hurricane Wilma damages?
23        A    Correct.
24        Q    You do recall that?
25        A    Yes, I do.

```
 1                    RONALD KELEMAN
 2       Q     Do you recall looking at this
 3   statement of values in your review of this
 4   claim?
 5       A     I would I have to say I probably
 6   did.
 7       Q     But sitting here today, you don't
 8   know one way or the other?
 9       A     No, I don't.
10       Q     Do you recall ever looking at,
11   either electronically or in another file
12   somewhere, any other version of a schedule of
13   values that would have related to the Copart
14   Wilma claims?
15       A     I don't recall.
16       Q     It's accurate to say that you would
17   rely on your senior claims handler personnel
18   to make sure to pull the right policy and
19   right SOV when handling a claim, right?
20       A     Yes.
21       Q     So that when you looked at a claim
22   file or audited a claim file, you had some
23   level of comfort that you were looking at the
24   right policy and right SOV?
25       A     Correct.  Right.
```

1           RONALD KELEMAN

2      Q    But that didn't happen here, right?

3      A    With regards to?

4      Q    The right policy and the right SOV.

5      A    Correct.

6      Q    Do you recall talking to anybody
7    else, Mr. McCarthy, Mr. Kush, when it was
8    discovered at some point in time that the
9    wrong policy and wrong SOV lived in the claim
10   file?

11     A    Most likely if this occurred, it
12   would go on to Mr. Dennis McCarthy.  And I
13   think, if I'm not mistaken, it would be they
14   had conversation, there was something with
15   Carlton and it probably did go on to Dennis
16   for review.

17     Q    Do you know what action Mr. McCarthy
18   took, if any?

19     A    No, I don't.

20     Q    Do you recall actually talking about
21   the issue with Mr. McCarthy?

22     A    No, I don't.

23     Q    Do you recall actually talking about
24   the issue with Mr. Clarke?

25     A    You know, at that time, there was

1                RONALD KELEMAN
2    the outside that's not insurance, we have an
3    understanding what's happening with the case,
4    with the file.
5         Q    Do you recall giving any kind of
6    specific instructions with how or when to cut
7    and paste e-mails?
8         A    No, never.
9         Q    Was there a working presumption that
10   e-mails relative to a claim should be put
11   into the electronic claim file?
12        A    Excuse me?  Could you repeat that.
13        Q    Sure.
14             Was there a working presumption
15   that e-mails relative to a claim should
16   be put into the electronic claim file?
17        A    I put all my notes in the file.  So
18   I told everybody to put everything in the
19   file that they write.
20        Q    And you would never alter anyone
21   else's entry?
22        A    Never.
23        Q    And you would expect none of the
24   claims handlers would do that, either?
25        A    Correct.

1                   RONALD KELEMAN
2        Q     Are you aware that the text of at
3   least one e-mail in this case was actually
4   altered in the electronic claim file?
5        A     No.  I did not know that.
6        Q     Let's look at Claim 8.
7        A     You said Claim 8?
8        Q     Claim 8.
9              And I'm going to show you an
10  e-mail.
11             MS. PURI:  This is Bates
12       USFIC1040.
13             (Keleman Exhibit 124, E-mail,
14       USFIC-1040, was marked for
15       Identification.)
16       Q     I'm going to hand you a e-mail from
17  Mr. Petrillo to Mr. Clarke.  In this e-mail
18  it says, "Good morning.  Yes, I heard from
19  the chief financial officer of the insured
20  who claims he has a $3 million loss.  And
21  then I heard from our field adjuster who
22  thinks the insured is crazy.  In any event,
23  I'm expecting a report from my field guy
24  shortly.  Carl."
25             Then if you take a look at

1          RONALD KELEMAN
2    Claim 8, bottom half of the page,
3    appears to be a cut and paste by
4    Mr. Petrillo of this e-mail, correct?
5        A    Correct.
6        Q    Except that there are words missing
7    and words changed, right?
8        A    Correct.
9        Q    You would never approve of
10   sanitizing a claim file in this matter, would
11   you?
12       A    Never.
13       Q    You didn't know that this had
14   happened before today, right?
15       A    Correct.
16       Q    Why wouldn't you approve of
17   sanitizing a claim file like this?
18       A    It's just you say the facts.  What
19   it is, you state it.  That's how it goes into
20   the file.
21       Q    Because the truth is the truth.
22            MS. MILLIKAN:  There's no answer
23       to that question on the record.  The
24       question wasn't a question, so ...
25            MS. PURI:  It wasn't a question,

Page 125

1                    RONALD KELEMAN
2        taken.)
3                    THE VIDEOGRAPHER:  We're back on
4        record.  Time is 11:34 a.m.  This is
5        going to be the start of Tape Number 2.
6        Q    Mr. Keleman, you would agree with me
7   that sanitizing a claims files is a dishonest
8   thing to do?
9        A    Yes.
10       Q    And you agree with me that
11  sanitizing claims files is unfair to do?
12       A    Yes.
13       Q    It's unfair to the insured, right?
14       A    Yes.
15       Q    We just spoke briefly off the
16  record.
17            It's accurate to say that you
18  were leaving the company as the final
19  claims decision was being made on
20  Copart's Wilma claims, right?
21       A    Correct.
22       Q    So that you were not intimately
23  involved in the final decision to deny
24  the the Yard 105 claim, right?
25       A    Correct.

1                    RONALD KELEMAN
2       Q     So in that event, adjusting the
Yard 105 claim really had nothing to do with
the overload of work based on the hurricane
catastrophes?
6             MS. MILLIKAN:  Same objections.
7       A     Again, I'm only going on the facts
we're speaking of.  I think Carlton tried to
expedite the claim with the information he
had at that point because of the prior claim.
So with regard to that, I don't think it's
something that was -- you know.
13      Q     Right.  And Mr. Clarke could have
expedited the Yard 105 claim by simply
getting the right SOV, right?
16      A     Correct.
17      Q     That wasn't something that should
have taken a year, right?
19      A     Again, under the circumstances, no,
it shouldn't have taken a year.  But again.
People were working 6 days a week, 12 hours a
day, and limited information coming back to
us from the outside vendors.
24      Q     But the information from the vendors
had nothing to do with what existed on the

```
 1                  RONALD KELEMAN
 2    right SOV, right?
 3         A    Correct.
 4              MS. MILLIKAN:  Objection.
 5    Argumentative.  Calls for speculation.
 6              Mr. Keleman, may I remind you to
 7    wait for a moment before you answer the
 8    questions, please.
 9              Can we straighten out the record
10    with a question and an objection and an
11    answer.
12              MS. PURI:  We have the question
13    and objection.  You want the answer?
14              MS. MILLIKAN:  He answered it as
15    well.  That's why I'm not clear whether
16    the record reflects a question,
17    objection and answer.
18              MS. PURI:  That's a good point.
19    It doesn't.
20              Did you get his answer?
21              It was a yes, but I don't know if
22    it --
23              MS. MILLIKAN:  I thought it was a
24    no.
25              MS. PURI:  Here we go.
```